BARENT DEKLYN and others

v.

SAMUEL DAVIS and others.

Complainant claimed the possession and property of a British frigate sunk in
the revolutionary war, on the ground that he had occupied her when dere-
lict; and prayed an injunction against defendants who hindered his opera-
tions in attempting to raise the vessel. Defendants, by an answer, claim al-
so to be the true occupants.

Injunction which had been ordered by the master was dissolved, the remedy
being at law, &c.

An injunction ought not to issue ex parte to transfer possession from one to an-
other.

THIS bill was filed by the complainants, as members of an      **1824.**
association formed on the 1st of May, 1823, for raising out of      April 19.
the water the British frigate " The Hussar," which, during      *Jurisdiction.*
the revolutionary war, and about 1781 or 1782, had sunk in      *Trespass.*
the East river, near Morrisania, in the limits of Westchester,      *Derelict.*
in sixty or seventy feet water, and was stated in the bill to be
abandoned and derelict. The complainants alleged, that with
much labour and expense, they had succeeded in the summer
of 1823, in discovering the precise situation of the ship; had
fastened chains around her, which they secured to floating
timbers, and raised her about ten feet from her bed, and per-
fectly occupied the vessel, and continued their occupancy, by
which she became their property. That at the approach of
the winter, they desisted from their labours by reason of the
weather, designing to resume the work in the following sea-
son. That the occupancy of the complainants continued un-

DEKLYN
v.
DAVIS.

1824.

til the defendants, with knowledge of the complainants' rights, on the 22d of March, with vessels, &c. moored and anchored over and around the sunken ship, blocked up the complainants' floating timbers, and enclosed a large space of water around them, and shut out the complainants from all access to their works or to the vessel.

The bill prayed an injunction against the defendants to desist from the further interruption of the complainants ; and also, that the defendants should be enjoined forthwith to remove the sloops, vessels, &c. placed by them in the waters of the East River, near and around the Hussar, and around the timbers of the complainants, fastened to her with chains, &c., and to depart entirely therefrom. An injunction to this effect had been granted by a master, and served on the defendants.

The defendant Davis, only, having now answered the bill, gave immediate notice of a motion to dissolve the injunction. On the other hand, a motion was made for an attachment against the defendants on affidavits, alleging actual contempt of the process of the court by some of them, but principally grounded on disobedience to that part of the injunction which directed the defendants to remove ; though it was also alleged that the defendants had increased and strengthened their works.

The defendant Davis, denied that the Hussar had been abandoned as derelict at any time since 1816, in which year a company had been formed, who occupied the sunken vessel, and worked at her in that year; and in 1817, cut a hole in her side, entered, and took from her 22 guns, a large quantity of rigging and other articles.

That in 1819, this defendant had invented a large machine of great power, for the purpose of raising heavy bodies from the bottom of rivers, &c., and was advised by some of the last mentioned company to come to New York and engage in the enterprise of raising the Hussar. That with a view to that object the defendant advertised in the papers of Baltimore and New York his invention, and offered proposals for the sale of shares to raise the necessary funds : and the plan being approved, after expending about $11,000 in preparations, he arrived in New York in September, 1822, with his machine-

ry, which, by order of the commissioners of the navy, was placed in the Navy Yard for safe keeping. That in consequence of the prevalence of the yellow fever, the citizens of New York had fled, and the affairs of the stockholders were so deranged that it was impossible to commence operations that season. But in September of that year, and before the complainants had formed any association, the defendant, in company with a person who had been formerly employed by the before mentioned association about the frigate, and also in company with several officers of the navy, and with several labourers, went to Morrisania, ascertained the precise situation and position of said frigate, took possession thereof, and to occupy the same, made his marks and ranges on the adjoining shore, so as to identify the spot, and enable him to commence his operations thereupon at the opening of the following season. And the defendant avers, that in the spring of 1823, and before the complainants associated in such enterprise, the defendant, in the city of New York, exhibited a drawing of his machine for raising said frigate, and publicly advertised in the newspapers of said city for subscribers of shares, many of which were sold ; which facts defendant believes were known to the complainants before and at the time they were associated to oppose the defendant and deprive him of his rights ; and the defendant avers, that these facts were public and well known to said complainants at the time when they combined together in May 1823, with a view to injure the defendant and deprive him of the benefit of his labor and expense about this enterprise. He avers also, that one of the associates with the complainants, applied to Major Wm. A. Barron to join them in their association, which Barron declined, and expressly informed them, that he was pledged to this defendant, who had been long engaged in and about the operation: and further advised them, that it was unjust in them to interfere with the defendant. But the complainants declared they intended to take possession of said frigate during the absence of the defendant, and to prevent him, by resistance, from proceeding towards raising the same. That in May, 1823, before the complainants had prepared any machinery, the defendant had leased the near-

18

1824.

DEKLYN
v.
DAVIS.

est shore of Mrs. Morris, the owner, after which, the complainants applied to her for the same purpose, and were informed of defendants' lease ; and the defendant states, that without the use of that shore neither party could carry on the work. But subsequent to all this, the complainants, in the absence of the defendant and his men, fraudulently and forcibly took possession of the frigate, by anchoring a sloop over her, and prevented defendant from working at her all that year, which possession is the same that the complainants have set up in their bill. Against these acts the defendant had remonstrated to the complainant Deklyn, who frequently promised to give up the possession if he should not succeed by a given day. That the defendants had never abandoned their rights, and that Deklyn had, in 1823, promised defendants to join them in the ensuing spring.

The answer then admits, that on the 22d March, 1824, the defendant Davis, in the entire absence of Deklyn and his men, took possession of the frigate, by anchoring sloops over her, and surrounding her with camels, machinery, &c. and had since been employed at the work, till restrained by the injunction. He denies that ever the complainants were in peaceable possession after the fall of 1822, but admits that they had timbers secured by chains to the vessel during the following winter ; and insists that the complainants had full notice of his enterprise, and of his possession taken in the fall of 1822, before they associated ; and that the defendant's enterprise was very public, being extensively advertised, and shares in it being sold in several of the states ; and that defendant has spent four years of time, and his association have expended about $12,000 in preparations for the object.

On the opening of the motion for the dissolution of the injunction, Mr. G. WILSON objected, that the three weeks allowed by the rules to except, were not expired.

But the COURT said it had often been ruled, and must be considered as the settled practice, that the defendant may move at any time to dissolve an injunction upon answer, since the equity of the bill may be denied so far as the injunction is concerned, even though the answer may be liable to exception

MR. S. M. HOPKINS for the defendant.

1st. This bill is simply a bill in trespass. It states the complainants to have been in peaceable possession of a personal chattel, in which they also had gained an absolute property by occupying it when derelict, and that the defendant then forcibly dispossessed them of it.

2d. An injunction against a trespass is hardly allowed at all; never but in cases very nearly assimilated to waste, and there is no case of it except when the freehold is affected. Eden on inj. 138, 9.; Stevens v. Beekman, 1 John. ch. 318.; Storm v. Mann, 4 ib. 21.

There is no allegation of any difficulty attending the complainant's remedy at law, even if it were possible that any such allegation could give jurisdiction in a case like this.

3d. The complainants' right is wholly denied. In which case, an injunction is not allowed to stand, not even in waste, much less in trespass. Eden on inj. 139.

4th. The defendant's possession is the prior, rightful, and bona fide possession, and the other is fraudulent and furtive.

On the rights of occupancy, and on the proofs of its existence and continuation, there is much to be read in the writings of the foreign and civil jurists; less so in those of England, where feudal and manorial rights, and the rights of the crown, have engrossed most of the subjects about which questions of occupancy arise in other countries. The subject is very fully explained by Pothier, in his Treatise on Possession; but we forbear particular quotations, unless any question should be raised by the counsel on the other side.

5th. This injunction is of a very unusual character, and must have been ordered by the master upon too little consideration. It is not only an injunction to do an act, but also to change a possession. If this can be done, no freeholder in the state is safe for a moment.

Mr. Wilson, in support of the injunction. This is a case of irreparable injury, unless the court can interfere; and it comes within the spirit of the later cases, in which the court has extended its injunction to the prevention of a trespass. Eden on inj. 138.

And we cannot admit that the answer in this cause shows any competent claim of right.

The defendant, Davis, says, in very feeble terms, that he "took possession," and "to occupy the same," he marked the shore and took bearings, but what did the defendant do? Had he ever manual occupation of the wreck? He does not presume to say so. This is far different from the possession of my clients, who descended to the vessel, passed chains around her, secured them by timbers on the surface, and thus kept up, through the winter, an actual, visible, and notorious occupancy, which continued to the moment the defendant invaded their rights.

It is not enough that a person has the intention to occupy; he must actually take the article into possession; into manual occupation. 2 Bl. Com. 156.; 1 Rutherford Inst. 75 to 81.

With respect to the nature of the injunction, there are cases in which a party was even ordered to do an act. And if any case can justify that measure it must be the present, in which the only hope of the party rests upon the preventive jurisdiction of the court. Our right will be unavailing without possession.

I observed in reply, that even if a manual occupation were necessary, the answer showed that we must have taken it. Davis says, that he ascertained "the precise situation and "position of the frigate," and then made marks and took bearings. Now she lies 60 or 70 feet under water; neither her precise situation can be known, nor can bearings be taken without first descending to find her.

But common sense rejects every such arbitrary rule as that of manual occupation. There must be "an occupation;" but the manner of that occupation is governed by the nature of the subject. Animals feræ naturæ, are in our occupancy as long, says Blackstone, as they have the animum revertendi: as a "tame hawk while pursuing his quarry." 2 Bl. Com. 392. Suppose pigeons to come from an unknown owner and to be domesticated in my pigeon-house; it is a case of lost property to the true owner, and I have no title but that of occupancy. But can I acquire no property in the pigeons till I have caught and touched them?

These are cases when the things in which we have property roam at large, but with the animus revertendi. Reverse

it now, and let the property be fixed, as in case of land, or of this wreck; the owner may now roam at large, and be in another hemisphere, and yet retain the possession, because HE has the animum revertendi.

To acquire a thing derelict, there must be the intent to possess and actual possession. But when once the possession is thus acquired, it is no more lost, unless there be " an " intent to lose or abandon."

Pothier, in the treatise before alluded to, is very full to this point, and supports his positions by the text of the civil law; and he instances the obvious cases of sleep, mental derangement, &c. to show that " without the intent to abandon, there is no abandonment." Œuvres de Pothier, 18 vol. of 12mo., Paris edition of 1782, pages 43. 44. 51, 52. He cites L. 4 Cod. de ac. poss. L. 3. §. 11. L. 25. 27. and see also dig. L. xli. tit. 2.

The occupancy must be regulated by the nature and exigency of the case. The defendant Davis, took possession in the presence of witnesses, and marked the shore, &c. Had the knowledge of this been confined to a few, it might have seemed ed colourable. But the magnitude and publicity of his preparations, while they put his good faith out of all doubt, are in reason and effect a much better continuation of possession through the winter, than buoys and signals could be.

THE CHANCELLOR. The right claimed by each of the contending parties, is the right of occupancy. Both parties have prepared means and have taken measures to raise the sunken frigate; neither party has yet effected that object; and neither party has yet obtained any actual or exclusive possession of the derelict subject. In this state of things, a suit has been instituted in this court. The complainants allege in their bill, that their acts of occupancy have obtained for them a title; and the defendants, by their answer insist, that their acts preparatory to an actual possession, have been such, as to give them a prior and superior right.

1. Does this controversy belong to the jurisdiction of this court? There is nothing in the nature of the subject as a vessel, or in the nature of occupancy as a title, which can con-

*Margin: 1824. DEKLYN v. DAVIS.*

*Margin: April 22.*

stitute this case, one of equitable jurisdiction. The first occupation in such cases, gives a title; but what is or is not an occupation, is here, as in other cases of possession, a question of fact, depending upon acts and intentions. That question is in its nature, peculiarly fit for the investigation of the courts of law and the trial by jury; and more eminently is it so, when conflicting claims derived from adverse acts of occupancy, are opposed to each other. In all similar cases, where a title to personal goods is claimed by a finder or first occupant, his right is tried and determined in the courts of law. The whole case stated in this bill, is that which would be presented to a court of law, in an action of trespass. The ordinary remedies of the law for the recovery of personal goods or damages, are fully applicable to this case, and entirely adequate to all the ends of justice. The peculiar situation of this sunken vessel, affords no ground of equitable jurisdiction; and if the case were before this court upon any ground of its jurisdiction, the adverse claims of the contending parties, could not be properly determined, without a trial by jury. It is not alleged, that the defendants are insolvent; that any contract exists between the parties; that there is in the case any fraud trust or other ground of equitable jurisdiction; or that there is any impediment to the ordinary remedies of the law against all or any of the defendants.

2. Injunctions to prevent trespasses on lands, though somewhat extended in modern times, are still confined to cases, in which the title is not doubtful, and the injury would be irreparable. Here, the subject is personal property; and no case has been found in which a court of equity has interposed by injunction, to award possession of derelict goods, to one occupant in preference to another. In this case, the right is disputed, the possession of either party, if either has any possession, is very incomplete; and there is no suggestion in the bill, that the injury to the complainants would be irreparable, if the subject should pass into the hands of the defendants.

3. The injunction issued in this cause, required the defendants not only to desist from the farther pursuit of their enterprise, but also, to remove their means prepared for rais-

ing the frigate, and to permit the complainants to proceed peaceably in their endeavours to raise the vessel. In this struggle to obtain actual possession of the derelict subject, and while it is uncertain whether the rights of the complainants, or those of the defendants are superior, the effect of the injunction is or might be, to change the possession of the subject, without any certainty, that the possession would pass to the party having title. To compel the defendants to desist, might be, and to some extent would be, to give possession to the complainants, when the defendants may have the better right. But while the right is contested, undecided and very uncertain, to award possession to either party, by an injunction from this court, would be to determine the main question of rightful possession, in a summary manner. In this view alone, the writ of injunction would be greatly misapplied, should it be used to transfer possession from one party to the other, in this case, in which from the nature of the controversy, possession must give to the party who can obtain it, a most important advantage.

With regard to the motion for attachment :

The injunction has not been fully obeyed. But as the exigency of this injunction was very peculiar ; as much is shown to excuse the disobedience ; and as the injunction is now dissolved on the merits ; the defendants must pay the costs of this application : and on that condition, the attachment will not issue.