# Philadelphia Company, Appellant, v. United Gas Improvement Company.

*Referee—Conclusiveness of referee's findings of fact—Review.*

To successfully challenge a referee's findings of fact, it is not enough to
point to evidence sufficient to support a different finding; but it must be
shown that there is no evidence sufficient to sustain his findings, and this
is especially so after they have been considered and approved by the court
below.

*Referee—Request for specific finding of fact.*

Where a referee is not asked to make a specific finding upon a partic-
ular subject, and his general findings are equivalent to a specific finding
upon the subject, the party against whom the finding is made has no just
ground of complaint.

*Contract—Agreement to supply natural gas—Minimum amount.*

A natural gas company agreed to supply a corporation with natural gas
for the use of its customers for illuminating purposes, specifying a mini-
mum quantity which the corporation would take, or, failing to take,
should pay for, and providing that if failure to take the specified mini-
mum shall be due to the permanent failure or diminution of the gas com-
pany's supply, the corporation should be required to pay for only the
quantity of gas actually received by it ; but if the failure of the corpora-
tion to take said minimum should be due to the temporary stoppage or
interruption of the gas company's supply, the corporation should be enti-

tled to a credit or reduction of the respective minimum quantities propor-
tionate to the number of consumers affected, and the length of time
during which such stoppage or interruption should continue.  Plaintiff
received pay for all the gas actually consumed.  An action by the natural
gas company to recover the difference between the price of natural gas
actually supplied to the corporation and the minimum sum agreed to be
paid according to the contract was submitted to a referee, who reported :
" Very early, however, in the first year of the contract, the supply (of gas)
sensibly diminished and continued to do so throughout the three succeed-
ing years, and, while perhaps more noticeable at certain seasons, was
decidedly appreciable at all times, by comparison of any subsequent
period with a prior one.  The evidence showed a persistent diminution,
notwithstanding the efforts made to augment it by the opening of new
wells and curtailing its use for manufacturing industries.  This diminu-
tion in supply caused a decrease in pressure which was immediately
apparent by its effects on the Welsbach light.  In the place of a bright
and steady incandescence, the flame became a dull red color, and the
light was practically useless." *Held*, that there was nothing due the plain-
tiff company.

Argued Jan. 26, 1897.  Appeal, No. 501, Jan. T., 1896, by
plaintiff, from order of C. P. No. 2, Phila. Co., Sept T., 1891,
No. 297, overruling exceptions to referee's report.  Before
STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL,
DEAN and FELL, JJ.  Affirmed.

Assumpsit to recover $46,520.20 for natural gas.

Exceptions to referee's report.

By agreement of the parties the case was referred to W.
Wynne Wister, Jr., Esq.

The referee's findings of fact were as follows :

The plaintiff is a company incorporated under the laws of
Pennsylvania, and having its principal office in the city of Pitts-
burg, engaged in the business of transporting natural gas from
wells in the surrounding territory, and distributing it through
pipes to the inhabitants of Pittsburg and its vicinity for light-
ing and heating purposes.  It was the only company in 1889
engaged in that business, all others, with one exception, hav-
ing been leased by it.  The value of its plant in that year was
upwards of $9,000,000, and the length of its line of pipes, includ-
ing the distributing system through the streets of Pittsburg,
over eight hundred miles.  In the year 1889 it was supplying

about fifteen thousand houses in the city of Pittsburg with natural gas as fuel. The defendant is also a Pennsylvania corporation, with its principal office in the city of Philadelphia, and owns or controls a majority of the stock of the Welsbach Light Company, the latter company being engaged in manufacturing a particular kind of burner for the furnishing of a better and brighter light from the consumption of artificial or natural gas.

In October, 1888, the plaintiff and defendant entered into an agreement by the terms of which the plaintiff, after the first day of January, 1889, was to supply the defendant with all natural gas required for illuminating purposes in all buildings or places with which it had or might have connection from its pipe lines for fuel gas, for the use of the defendant's customers who used the Welsbach burner; the gas to be supplied from the service pipes inside the buildings and after passing the pressure valves. The gas was to be measured by a meter furnished by defendant, and to be charged for at a fixed rate of so much per thousand cubic feet; the meter and attachment for the supply to be under the inspection, and subject to the approval of the plaintiff. The defendant agreed to consume in the first three years of the contract not less than two hundred and seventy-five million cubic feet of gas, and in case less should be consumed to pay for that amount.

Prior to the time of making the contract the plaintiff had supplied most of its customers with gas for fuel purposes without measurement, at so much per month or year, but had already in contemplation a change in this method, and had, in fact, begun the introduction of meters with the view of selling the gas by actual measurement. In 1889 there were about four thousand of these meters in operation, and these were increased until there were over thirty thousand. Shortly after the contract of October, 1889, went into operation, and defendant was supplying the gas to consumers using the Welsbach light, it was found that the cost of the meter to measure the consumption was greater than the amount consumed would warrant. The original contract was therefore modified by an agreement by which the plaintiff was to furnish all the gas required by defendant for its customers without measurement, at so much per annum for each light. The amount to be paid was calcu-

lated on the basis of what each burner of a certain type would consume at a fixed pressure, and this was found by actual measurement to be fifteen hundred cubic feet per annum, at the regulated pressure of four ounces at the point of supply, which was equivalent to fifty-two and one-half cents per annum for the ordinary Welsbach burner used in dwelling houses, with a corresponding increase for those of larger size. The defendant stipulated in this agreement, in lieu of the minimum amount to be consumed during the first three years of the contract, to pay a minimum sum of $55,000—$10,000 the first year, $20,000 the second, and $25,000 the third. The plaintiff exercised no supervision over the price the defendant charged its consumers for the gas, which was one dollar per thousand feet under the original agreement of October, 1889, and under the modified one of May, 1889, where the gas was furnished free of measurement, at the average sum of three dollars and seventy-five cents per annum for each burner, including the gas.

The defendant had already obtained a number of customers, and made many connections with the service pipes of the plaintiff before the latter began the general introduction of its meters. It was the invariable custom of the Philadelphia Company in placing a meter, to put it as near the point where the supply entered the building as possible, in close proximity to the regulator, an instrument designed to prevent a pressure above four ounces. The defendant had previously placed the meters it furnished under the supervision of the plaintiff at such places as were convenient for obtaining the gas for illumination, without reference to the point of entrance of the service pipes. In buildings where the plaintiff introduced meters subsequently to those of defendant, and between the latter and the point of supply, the effect was to measure all the gas that entered the building, both that used as fuel and that which afterwards passed through the defendant's meters for illumination, so that the gas was measured twice. Great dissatisfaction arose from this cause, and defendant received numerous complaints from its customers, who maintained that they were unjustly charged for the gas for illumination, contrary to the express agreement, and if they had to pay plaintiff for the gas, would no longer continue their contracts with the defendant, and many had them canceled for that reason, over eight hundred lights being

changed from contracts for consumption of gas to those for the use of the burner alone. The plaintiff was notified of these complaints, and requested to so arrange its connections for meters as not to interfere with defendant's, or to inform the latter where it intended to put in a meter. No adequate steps were taken to remedy the trouble, the plaintiff claiming that it was entitled to put in its meters where it deemed best, and that it was so understood by both parties to the contract, and if defendant was dissatisfied with the place, it was the latter's duty to change its connections so as to obviate it.

The gas furnished by the plaintiff was brought from its wells in the surrounding country, some of which were a distance of thirty miles, by means of pipe lines, and then distributed for consumption through the city mains. The supply in the early part of 1889 was ample, and the plaintiff experienced no difficulty in maintaining the requisite pressure of four ounces at the regulators. In that year and the following ones the demand for domestic purposes increased in a greater proportion than the wells could supply, and the latter at the same time diminished in volume. Many new wells were opened, and the supply for factories and furnaces largely curtailed, without producing a satisfactory result. It still continued to diminish. The diminution in supply was most marked during cold weather, when it would sometimes fail to be of any practical value. During the summer it was not so noticeable. There was no method of storing any increased supply for future use except by shutting off a certain number of wells, and so far as possible confining it therein. The decrease in volume of gas was attended by a decrease in pressure, and where the latter fell below the standard of four ounces at the point of supply, the gas was insufficient for illuminating purposes. At the requisite pressure the Welsbach burner maintained a proper incandescence, and gave a bright white light; when the pressure decreased in volume it became a dull red, and ceased to furnish any illuminating power. Before the modified agreement of May, 1889, was adopted, a number of experiments were made by the parties or their representatives, by which it was shown that the pressure necessary to render a Welsbach burner of practical use was four ounces. This was the pressure that the regulators used by the plaintiff on its service pipes were con-

structed to maintain by restricting any excess above that figure. In 1888, and beginning of 1889, the pressure at the central stations of the plaintiff showed an average far in excess of four ounces. After the summer of 1889, and during the succeeding years, the supply from the Murrysville and Grapeville region, two of the largest sources of supply, decreased from one hundred and eight pounds to eighty-four pounds in the former, and from two hundred and twenty-two to one hundred and thirty-six in the latter, and at the same time the pressure at the central stations showed an average decrease of between fifty and eighty per cent, sometimes falling as low as half a pound. To remedy the decrease in pressure at the point of supply, and preserve the efficiency of the defendant's lights, the plaintiff resorted to the device of blocking the regulators. The rubber diaphragm that restricted the pressure was kept open by a piece of wood, and the gas allowed free egress. The remedy did not succeed. The lights still continued unsatisfactory. The customers of the defendant, after frequent and repeated trials, were dissatisfied with the uncertainty and want of reliability of the light, and as no dependence could be placed on it when most needed, finally had it removed and ceased to be consumers of the gas as an illuminant. The lights had at first proved eminently satisfactory, and the defendant rapidly increased the number of its customers. After the diminution in supply occurred, and its uncertainty became apparent, the applicants for gas gradually decreased, and defendant practically abandoned its efforts to solicit consumers of gas. From May, 1890, to June, 1892, over one thousand burners were removed on account of the scarcity of gas and consequent dimness of the light. The consumption of gas by defendant during the first three years of the contract fell far below the minimum represented by the sum agreed to be paid. It was admitted that the plaintiff had received payment for all the gas actually consumed during that time.

The amount of plaintiff's claim as proved was $7,149.71, with interest from January 15, 1890; $16,314.22, with interest from January 15, 1891; and $23,056.28, with interest from January 15, 1892.

The referee recommended that judgment should be entered for the defendant.

Exceptions to the referee's report were dismissed by the court.

*Errors assigned* were in overruling exceptions to referee's report.

*George Tucker Bispham,* with him *John Hampton Barnes,* for appellant.—The diminution in the supply of gas was not the proximate cause of the failure of the Improvement Company to perform its contract. It was not sufficient for the defendant to show a decrease generally in the supply of gas. If the supply was sufficient under the terms of the contract to furnish the gas which it was entitled to draw for illuminating purposes, then it is immaterial whether or not there was a decrease in the quantity of gas. The burden of proof was upon the defendants to affirmatively show this fact and its immediate connection with their failure to take the gas: Wilson v. Coal Co., 161 Pa. 503.

The contract was severable as to each year.

*Charles E. Morgan, Jr.,* with him *Francis D. Lewis,* for appellee.—The burden was upon the plaintiff as exceptant to satisfy the court below that in his findings, the referee, who saw and heard all these witnesses, and was thus able to determine that which the court was unable to do,—the weight which should be given to their testimony,—was guilty of " obvious mistakes " or " unwarranted conclusions: " Hibbs v. Woodward, 15 W. N. C. 338; Adleman v. Steel, 13 Phila. 529; Clark v. Sullivan, 2 Kulp, 324; Ellison v. Hosie, 147 Pa. 337.

The referee's conclusions were not only justified by the testimony before him, but were, in fact, absolutely unavoidable.

OPINION BY MR. CHIEF JUSTICE STERRETT, March 1, 1897:

This action of assumpsit, to recover the difference between the price of natural gas actually supplied to defendant, and the minimum sum agreed to be paid according to contract, was submitted to a referee, under the act of May 14, 1874, whose findings of fact and conclusions of law were both in favor of the defendant. Exceptions to the report of the referee were considered by the court below and dismissed, and the report was thereupon confirmed, and judgment entered for defendant. Hence this appeal, in which we are asked to reverse both the referee and the court below on findings of fact as well as conclusions of law.

If the learned referee's findings of fact are correct, his conclusions of law necessarily follow. To successfully challenge the former, it is not enough to point to evidence sufficient to support a different finding. It must be shown that there is no evidence sufficient to sustain the referee's findings ; and this is especially so after they have been considered and approved by the court below. Without attempting to refer to the evidence in detail, it is sufficient to say generally that a careful consideration of it has satisfied us that there is no substantial error in any of the learned referee's findings of material facts. His clear and satisfactory report evidences the care and ability with which the case was tried and disposed of by him. We are all satisfied as to the substantial correctness of his conclusions. It is contended, however, that to support the referee's conclusion of law, he should have found specifically that the diminution in the supply of gas was the proximate cause of defendant company's failure to use the minimum of gas specified in the contract. A sufficient answer to this is, that he was not asked to make any such specific finding. If, therefore, his general findings are equivalent thereto, the plaintiff has no just cause of complaint.

By the agreement of October 5, 1888, the plaintiff company —theretofore as then engaged in the transportation and delivery of natural gas, principally for fuel, in the city of Pittsburg and its vicinity—covenanted with the defendant company— then desiring " to engage in the business of supplying said gas to be used as an illuminant by means of or in connection with its appliances (Welsbach burners) designed to fit said gas for such use "—to supply it with " all natural gas required for illuminating purposes in all buildings or places with which said first party now has or may hereafter have connections from pipe lines or mains owned or operated by it for fuel gas supply, so long as contracts made by consumers with said first party for fuel gas supply shall continue in force ; said gas to be supplied by said first party from its services inside of the buildings, and after passing its pressure valves." The contract was for three years, and specified a minimum quantity which the defendant would take each year, or, failing to take, would pay for. Clause 6 of the contract provides, inter alia, as follows : " If the failure of said second party to take the respective minimum

amounts of gas mentioned in the third paragraph hereof shall be due to the permanent failure or diminution of said first party's gas supply, said second party shall be required to pay for only the quantity of gas actually received by said second party; but if the failure of second party to take such respective minimum yearly amounts shall be due to the temporary stoppage or interruption of said first party's gas supply, said second party shall be entitled to a credit or reduction of said respective minimum quantities proportionate to the number of consumers affected, and the length of time during which such stoppage or interruption shall continue."

It was admitted, as reported by the referee, that the plaintiff had received pay for all the gas actually consumed. Whether it was entitled to recover the difference between that amount and the minimum sum agreed to be paid was the question in controversy. That question has been fully and carefully considered and correctly decided by the referee. His findings of fact, approved by the court below, were amply sufficient, as already stated, to justify his conclusion. Among other things, he reported as follows :

"Very early, however, in the first year of the contract, the supply (of gas) sensibly diminished, and continued so to do, through the three succeeding years, and, while perhaps more noticeable at certain seasons, was decidedly appreciable at all times by comparison of any subsequent period with a prior one. The evidence showed a persistent diminution, notwithstanding the efforts made to augment it by the opening of new wells and curtailing its use for manufacturing industries. This diminution in supply caused a decrease in pressure which was immediately apparent by its effect on the Welsbach light. In the place of a bright and steady incandescence, the flame became a dull red color, and the light was practically useless.

" The material questions are not the extent of diminution, whether excessive or otherwise; not the amount of pressure at the stations, whether one pound or more; but was there an insufficiency of gas for illumination, and was such insufficiency instrumental in causing the defendant's failure? Keeping these in view and considering the evidence directly relevant thereto, —the testimony of plaintiff's employees, the act of opening the regulators to allow a free flow, and the actual abandonment of

the lights for want of gas—it is scarcely possible to escape the conclusion that they must be answered affirmatively, and that the defendant is correct in the allegation that the contingency contemplated and provided for occurred."

In view of the facts established by the learned referee's findings, the question whether the contract is entire or severable becomes unimportant. In neither event, according to those findings, was anything due the plaintiff company.

Judgment affirmed.