## Fidelity-Philadelphia Trust Co., Executor, *v.* Lehigh Valley Coal Co., Appellant.

48

Argued April 17, 1928.   Before Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*Ralph B. Evans*, with him *F. W. Wheaton* and *P. F. O'Neill*, for appellant.—The evidence does not support the referee's inference of fact that Carter never abandoned the culm banks in question.

Carter's possession of the banks and the land on which they were deposited consisted merely in this, that from 1862 until 1876 he continued to use the land as a convenient dumping ground for his refuse. This in itself does not amount to possession, in the legal sense, sufficient to furnish the basis of a claim of title: Stark v. Coal Co., 241 Pa. 597.

The question of abandonment is to be determined as of the time when Carter commenced operations.

The referee failed to find as a fact whether or not Carter knew that the culm was being deposited on defendant's property.

Carter never acquired title to the culm which had been deposited by his predecessors: Doster v. Zinc Co., 140 Pa. 147.

Whatever rights plaintiffs may have had have been lost by lapse of time: Wickersham v. Lee, 83 Pa. 422; Pitts. & C. R. R. v. Byers, 32 Pa. 22; Campbell v. Holt, 115 U. S. 620; Hamilton v. Hamilton, 18 Pa. 20; Knauer v. McKoon, 19 Pa. Superior Ct. 539.

*Russell Duane*, of *Duane, Morris & Heckscher*, with him *Henry A. Craig*, for appellee.—The findings of fact

of a referee selected under the provisions of the Act of May 14, 1874, P. L. 166, are conclusive if there is any evidence sufficient to sustain them, and this rule is, in the absence of manifest error, enforced by this court where a referee has drawn inferences from facts and made findings thereon: Phila. Co. v. Gas Co., 180 Pa. 235; Sykes v. Thornton, 223 Pa. 589; Stark v. Coal Co., 241 Pa. 597.

In conformity with the referee's findings, plaintiff contends that, from 1862 until his death in 1893, Carter had open, continuous, exclusive and notorious possession and control of the culm banks and the underlying land. Defendant seeks to oppose this contention.

After permitting Carter, and later his executors, to occupy the land for more than forty years without complaint, its owners could not expect them to remove the culm, at least without notice so to do, and should not be allowed to penalize them for their failure to remove without notice on any theory of forfeiture or abandonment: Empire S. & I. Co. v. Lawrence, 27 Pa. Superior Ct. 620; Leininger v. Goodman, 277 Pa. 75.

The statements and declarations by Carter possessed all of the characteristics necessary to satisfy the rule as to the admissibility of utterances as verbal acts: Nulton v. Nulton, 247 Pa. 572; Arnold v. Cramer, 41 Pa. Superior Ct. 8; Merigan v. McGonigle, 205 Pa. 321; Mickey v. Hardin, 79 Pa. Superior Ct. 592.

No question of abandonment can arise as long as Carter had the possession and control over the banks which the referee has found as a fact existed throughout the whole period from 1862 to 1893: Sturdevant v. Thomson, 280 Pa. 233.

In every definition of abandonment to be found in the textbooks the concurrence of relinquishment of possession and the intent to relinquish title is insisted on: Com. v. Koontz, 258 Pa. 64; Patterson v. Williams, 52 Pa. Superior Ct. 299.

The case is ruled by Sturdevant v. Thomson, 280 Pa. 233.

OPINION BY MR. JUSTICE FRAZER, September 24, 1928:

William T. Carter died in 1893, owner of the Coleraine mining property in Carbon County, and in the same year his executors, the late Wayne McVeagh and the Fidelity-Phila. Trust Co., the latter now sole surviving executor, sold the land, comprising 327 acres, with two coal mines thereon, together with the buildings and one large culm bank, known, in these proceedings, where it figures only incidentally, as No. 2 bank and occupying space on the land sold. No other property was included in the sale. In 1905, twelve years after the death of Carter and the sale of his holdings, the executors received information from Charles Carter, son of deceased, that the Carter Estate claimed title to another large culm bank, here designated as No. 1, located on land adjoining the Carter property, formerly owned by Coxe Brothers & Co., also coal operators, but afterwards acquired by purchase by the Lehigh Valley Coal Company, appellant. Three years later, in 1908, the executors formally asserted, in written communications to appellant company, title to the No. 1 bank as executors under decedent's will, declaring that the bank had been formed by deposits of mine refuse from Carter's No. 1 mine, between the years 1862 and 1876. Appellant company refused to recognize the claim, asserted in its turn legal title to the culm, and in 1908 proceeded, by means of washery operations, to reclaim the small sized coal mixed with the culm, and, as admitted, realized a profit of $75,251.34 from the sale of the coal thus reclaimed. In the same year, 1908, an action of trespass was instituted against appellant by Carter's surviving executor, the Fidelity-Philadelphia Trust Company, to recover the sum of $462,312, which it claims was the market value of the coal and which, as it alleges, was wrongfully converted by appellant to its own use. By agreement the case was referred for deter-

mination to a referee under the Act of May 14, 1874, P. L. 166. Because of the difficulty in obtaining testimony of witnesses who had personal knowledge of conditions in and about the Coleraine mines at the time and after Carter took possession in 1862, the hearings before the referee were prolonged to January, 1922. The case was later argued before the referee and on November 18, 1926, he filed his report, awarding damages to plaintiff in the sum of $144,920.49. Exceptions to the report were filed by defendant; these were overruled by the referee, and in a brief opinion the lower court confirmed the report and entered judgment for plaintiff in the sum of $154,968.30, which amount included interest on the sum awarded by the referee and $5,000 as his fee. From this judgment the coal company appealed.

On July 1, 1862, Carter and his then partner, Schoener, took possession of the collieries and breakers No. 1 and No. 2, under an assignment of a lease from Ralston and Johnson, the then operators. During their working of the mines, from 1862 to 1876, the culm therefrom, consisting of dirt, slate and small sized coal, then not usable and of no market value, was deposited upon two different locations, the culm from No. 2 breaker being dumped on a pile situated on the Carter land, while the culm from No. 1 breaker was deposited on a spot close to that breaker, but on land then owned by Coxe Brothers & Company and later acquired by appellant. It is the latter culm bank, located on this adjoining land, we have in dispute here. The evidence as to the material question of the time of the origin of the culm heap is conflicting, plaintiff claiming it was started in 1861 by Ralston and Johnston, while appellant asserts that the first deposits were made at least previous to 1856. In 1876, No. 1 mine with its breaker was abandoned by Carter and thereafter no more culm was dumped on that particular pile. At the time the sale of Carter's property was made in 1893 no mention of the culm bank was made and there was no attempt to in-

clude it in the conveyance, for the reason, as given in plaintiff's statement of claim, that the executors "remained in ignorance of said decedent's right and title to the aforesaid deposits of culm which, as averred, stood on adjacent ground not owned by decedent, and therefore not conveyed by plaintiffs."

The main answer of defendant is that Carter, neither at the time of his death nor at any time previous, had any right or title of ownership to the culm, for the reasons, among others, that when he deposited it on land not his own he intermingled it with culm previously, placed on the same location by his predecessors during the time they operated the Coleraine Collieries; that he used this manner and place for getting rid of what was then regarded throughout the anthracite coal mining regions as a thing of no value, an annoyance troublesome to dispose of; that he knew he was depositing the culm on land to which he had no title; that he never exercised any act of dominion over it or asserted title to it; that through a long course of years vast quantities of culm were taken and carried away by persons when and how they desired without compensation to Carter; and that under these facts and circumstances Carter intended to relinquish and abandon any legal interest he may have had in the culm and that he did in fact abandon the culm and all claim of title to it.

The referee found, inter alia, that the immediate predecessors of Carter, Ralston and Johnson, were the originators of the culm bank in 1861; that they abandoned the culm when their lease of the Coleraine property was assigned to Carter and his associate in the following year; that Carter appropriated this abandoned culm upon taking charge of the mines; that there was insufficient evidence to warrant a definite finding that Carter knew he was depositing the culm on land not his own, and that he had not abandoned it or his claim of title to it.

We have with minute attention examined the evidence in the record before us, and while reluctant to disturb the conclusions of the referee, we are constrained to hold that certain of his findings are far from being supported by the facts established by the evidence and should not have been found proper for confirmation by the learned court below. The controversy involves mainly questions of fact and accordingly, as we said in Gordon v. Petty, 291 Pa. 258, page 260, the case requires for correct determination a knowledge of locality and is consequently peculiarly for the decision of the court of first instance, and where we also said: "Unless we were clearly satisfied that an erroneous result has been worked out by the chancellor who heard the witnesses and is familiar with the properties involved, we would not overturn his conclusion." We are not unmindful of the rule referred to in appellee's brief, as stated in Phila. Company v. U. G. I. Co., 180 Pa. 235, 242, that "to successfully challenge [the findings of a referee] it is not enough to point to evidence sufficient to support a different finding. It must be shown that there is no evidence sufficient to sustain the referee's finding; and this is especially so after they have been considered and approved by the court below." At the same time we have in mind the following apt words of this court in Hindman's App., 85 Pa. 466, 470; "When he [the master] reports facts directly proved by the witnesses, his report is entitled to great weight. But when the fact is simply a deduction from other facts reported by him, his conclusion is the result of reasoning, the correctness of which we are as competent to judge as he."

Appellant's first assignment of error is to the action of the court in overruling the exception to the referee's eighth finding of fact to the effect that "there is not sufficient evidence to warrant a definite finding on the question whether or not Carter in fact knew he was depositing the culm outside the boundary line of the Coleraine land." This, of course, involves the question as to

whether Carter was aware of the location of the boundary line which separated his land from the adjoining property on which stood the culm pile in dispute. Both the referee and counsel for plaintiff regard this phase of the case as immaterial. We are of directly opposite opinion. We quote with approval the words of appellant's counsel in their printed argument: "It seems to us that this is one of the most material facts bearing on the question of abandonment. If Carter did not know he was depositing culm on land which he did not own, this fact would certainly go a long way toward negativing any inference of abandonment. But, conversely, if he did know this fact, coupled with the fact that the culm was of no value, he simply followed this course as the most convenient way of getting rid of what was then generally regarded as a source of annoyance and expense." He was thus, as appellant contends, throwing away upon another man's land useless and valueless refuse from his mine and thereby relinquishing at once all title and interest in it. It seems then perfectly essential that we discover definitely, as far as the evidence reveals, whether or not Carter knew it was not his land upon which he was placing the culm. In fact, the importance of a specific finding, one way or the other, was so thoroughly recognized at the hearings before the referee that both parties asked for it. These requests of themselves carry weight as to the necessity of reaching a conclusion. We are referred by appellee's counsel to Phila. Co. v. United Gas Improvement Co., supra, as an instance in which we refused to set aside a referee's report where he failed to make a specific finding on one phase of the controversy. In that case, however, we agreed with the referee that the finding he declined to make was not a material question, nor had it been requested by counsel, and we said: "A sufficient answer to this is that he was not asked to make any such specific finding. If therefore his general findings are equivalent thereto, the plaintiff has not just cause for complaint."

That is not the situation in the case before us. Here we have requests from both sides for such finding, which requests were ignored, and our examination of the referee's report does not, in our opinion, reveal that his general findings are equivalent to a definite finding as to whether or not Carter was aware he was throwing his culm on land not his own. He has simply found that "there is not sufficient evidence to warrant a definite finding." We cannot accept that conclusion in the face of the record before us, and we therefore decide that the referee manifested error by not giving due weight to the proofs. In Worrall's App., 110 Pa. 349, 362, we said: "Whether the court [of first instance] agrees or disagrees with the master's findings on appeal, the appellate court shall in like manner determine if the facts have been rightly found. When the appellate court is satisfied that the facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake made. In the several stages of the proceeding there is no place for a perfunctory consideration of the evidence relative to facts in dispute." The referee having failed to take into adequate consideration certain elements in the case of a decisive nature, it is our right to give them such consideration, and from such examination make our own finding. "We are at liberty, though not required, to look into the evidence and to find the fact ourselves": Leonard v. Smith, 162 Pa. 284, 288; and this we shall now proceed to do.

It is essential, to clear up this phase of the case, to first find from the evidence at what period the culm bank in dispute actually originated; that is, when and by whom the first deposits of culm from No. 1 breaker were made on the ground occupied by the heap and owned by Coxe Brothers. In disposing of this point,—the time of the origin of the culm bank,—we shall reach a reversal of the referee's third finding to the effect that the originators of the bank were Ralston and Johnson, who oper-

ated No. 1 mine and breaker immediately preceding Carter. Unquestionably they threw their culm on this spot, but there is direct evidence that not only were they placing it there in 1856, five years before the date set by the referee as the time of the origin of the culm bank, but that the pile was actually started previous to 1856 by deposits of culm on the same ground by operators who worked the mines before Ralston and Johnson took charge. A witness, Lawrence Boyce, born in 1847, who lived close to the Coleraine property, testified he had worked as a breaker boy for Ralston and Johnson in 1856 and that No. 1 breaker was standing at that time. Asked if he remembered who operated the mine previous to the latter firm, he said: "I have a recollection of two parties. They were Clevery and Currington." Another witness, Stephen Farrow, a justice of the peace at the time he testified, who was born in 1847 and lived a great part of his life in the vicinity of the mines, when asked if he knew who preceded Ralston and Johnson, said: "We boys said Cleaver & McKnight. Q. They were there before Ralston and Johnson? A. Yes, sir?" Still another witness, John Martyn, nearly eighty years old, and a brother-in-law of Carter, and for whom he was mine superintendent in 1862, testified as follows: "Q. Did you ever hear of a man by the name of Cleaver in connection with the operation? A. Yes, sir. Q. What connection did he have? A. I don't know; he was there before I came. I know he was in Coleraine as an operator for a while." It was also testified by James Hughes, seventy-six years old, who worked for Ralston and Johnson in the breaker in 1857, that the culm was being deposited on the same site at that time. We find no warrant for discarding this testimony, as the referee has done and as he should not have done. The witnesses who gave it were certainly as worthy of credit as any of the others heard; and plaintiff presents no evidence which affects the reliability or weakens the force of their statements. It is thus evident, as shown by testimony

on both sides, that the culm heap had reached, in 1862, when Carter began to operate the mines, quite large proportions and these proportions had not been attained by deposits by Ralston and Johnson alone, but also by those of the operators who preceded them. Since, then, as we find, the culm heap was in existence at least six years before Carter began operations in 1862, did he know when he dumped the culm from his mine on the existing heap that he was not placing it on his own land? Such lack of knowledge as to a boundary line could of course be possible; but the evidence clearly proves it was not possible in the present case. The principle is applicable here that an owner is presumed to know the boundaries of his own land; and assuredly Carter had ample opportunity,—opportunity in fact thrust upon him,—to have this knowledge with respect to the Coleraine property. He was familiar with the region in which his mines were located, accustomed to examine and watch over all details pertaining to his mining interests and in his acquisition of the Coleraine colleries was guided by the legal advice of one of the eminent lawyers of that time. It is not then to be reasonably presumed that so careful and prudent a man as he was shown to be by the numerous witnesses who knew him personally, would be satisfied to pay no attention to such an important matter as the exact extent of the land he first leased and then, in 1864 with his associate, acquired by purchase for the price of $150,000. The conveyances in these transactions contained full information as to the boundary and they were at hand to examine. He must have examined them. "It is a clear elementary principle, that the law imputes to a purchaser a knowledge of every fact of which the exercise of ordinary diligence would have put him in possession": (Alexander v. Kerr, 2 Rawle 83, 89) ; and a recital in a deed is notice to the purchaser of the fact recited: Jennings v. Bloomfield, 199 Pa. 638, 641. The deed was the foundation of any right that could be acquired from the vendors of the coal land; it

is to be presumed that he saw the instrument conveying the land, and seeing it, was informed of the exact location of the boundary line: Gibson v. Winslow, 46 Pa. 380, 385; Bright v. Allan, 203 Pa. 394, 399. In those conveyances the boundaries were set forth with particularity, and the line, along which stood the culm bank between Carter's land and that of Coxe Brothers, was not only described by courses and distances, but also signalized by monuments of trees, a rock and a post; and that this line was in conformity to official surveys is established by three successively executed indentures: the lease by which the Coleraine property was turned over to Carter in 1862; the deed by which Carter and Schoener bought the land in 1864 for $150,000, and the deed by which in 1876, Carter purchased the interest of Schoener, making the former sole owner of the mines. Carter, always active and watchful as the head of his mining operations, was, as witnesses testified, acquainted with all details of operations. One of these details that imperatively required knowledge of the exact line of the boundary, was the necessity of preventing his mining operations from extending over and encroaching upon adjoining property of Coxe Brothers. By the terms of the lease of 1862 he was distinctly required to refrain from such encroachments. The lease provided that lessee "will leave pillars of coal undisturbed twenty yards thick between the excavations and the lines of the adjoining tracts of land, and will not mine or make any tunnel or gangway or slope or any other opening at any time between twenty yards of the lines of said adjoining tracts of land." This provision was scrupulously observed, even to the extent of diverting the angle of the slope so as not to invade the contiguous Coxe property. Certainly this extremely important matter of preventing illegal invasions of adjoining land was not carried on without the knowledge and direction of Carter, who gave personal attention to the management of his mines; and a prerequisite to his knowledge and the giving of

such directions would be an acquaintance on his part with the location of the boundary line on the surface. Incidental and necessary to the work of forestalling encroachments were the periodical surveys made within the mines, based on the surface boundaries. It is true, no witness testified they knew where the line lay between the Carter and the Coxe land. It would be exceedingly surprising if they did. As employees, they had no concern whatever in that matter, and if they saw no visible marks of boundary, it was doubtless because they never had occasion to look for them. Nevertheless, we find that the line was a matter of solicitude in 1867. One of plaintiff's witnesses, Evan Gibbons, testified: "No, I don't know the exact location of the land line, but I know the land line came down there and I have seen the surveyor going down there; and I heard men talking about it." To assume, in the face of the evidence thus detailed that Carter was ignorant of the actual location of the boundary, is to assume that he deliberately chose to be so ignorant. There is nothing in the record to warrant such assumption; and having knowledge of the location of the boundary line, it follows that he was aware, when he deposited the culm on the heap already existing on the Coxe land, that he was not placing it upon his own property. Appellant's first assignment of error is sustained.

The referee concluded in his findings of fact that Carter never abandoned the culm and also found as a conclusion of law that "the legal presumption of continued ownership by Carter of the culm in the banks was not overcome by sufficient testimony to justify a finding that the title thereto was lost by abandonment." Against these conclusions appellant's second and third assignments are directed. Our examination of the evidence leads us to the conviction that here again the referee is in manifest error. It is not the contention of appellant, as we understand it, that Carter abandoned the culm at any intervening period between the time he first began

depositing the culm in 1862 and the date of his death in 1893. The contention is that the act of intentional and actual abandonment was coincident with the first dumping of the culm on the adjoining land and that the subsequent deposits were but a continuing process of that abandonment. We agree with the finding of the referee that the culm deposited by Ralston and Johnson, Carter's immediate predecessors, was abandoned by them when they ceased control of the mines in 1862; and, certainly the record discloses nothing to break the presumption that the culm they found there when they started to work the mines had been similarly abandoned by their predecessors. The latter selected a convenient spot on the adjoining Coxe land, for which the owners appeared to have no use, it being, in the words of the referee, in a "wild and uncultivated state," and simply dumped their culm there to get rid of it; and, so far as the evidence enlightens us, never paid further attention to it or made claim of ownership; and this was precisely the attitude of Ralston and Johnson toward the culm bank when they relinquished control of the mines to Carter. In fact, so nonexistent in the minds of everybody was a claim of title that when the owners of the mines leased and then sold them to Carter and his associate the culm bank did not figure in the lease or any of the conveyances.

Did Carter appropriate the culm left by his predecessors? To appropriate, in the sense required here, is to exercise dominion over an object to the extent and for the purpose of making it subservient to one's proper use and pleasure; to take to oneself to the exclusion of others: 4 C. J. 1457. It is evident that Carter made no bargain or other arrangement with Coxe Brothers with respect to a continued use of the culm heap as a dumping ground, nor did he even go to the bother of directing his employees to place culm there. When he began operations they simply went ahead, without cessation of operations, and deposited the refuse from the breaker upon the old location, commingling it with what was

there at the time. Carter might have dumped the culm on his own land close to the breaker. There is no evidence to show that he placed it upon the neighboring property as a matter of necessity or that there was not sufficient space on his own land near the mine upon which to deposit it. In fact, it appeared so much as a matter of course to Carter and his employees that the existing pile was the most convenient spot on which to place the culm they were producing; all he did was to continue the practice of former operators of throwing the refuse upon what seems to have been considered a kind of common dump pile for such useless material. Neither Carter nor his superintendents gave directions as to where to put the culm. John Martyn, Carter's brother-in-law and his mine superintendent in 1862, gave direct evidence to that effect. He said: "There was no cessation of work by Ralston & Johnson going out and Carter coming in,—these workings went every day when I came there; they continued to haul dirt the next day as the day before, there was no direction about it,—there was the truck and there was the dump car"; and he added that he himself never gave any directions, as to the disposal of the culm. It was therefore a matter of convenience. The original pile was close at hand; a trestle built by his predecessors enabled Carter to take the culm from his breaker to the bank, as had always been done before him, and he thus escaped the necessity of encumbering his own land with refuse of that character. For fourteen years this was the place and manner by which Carter got rid of culm. We think the most liberal interpretation of Carter's attitude toward the existing culm bank does not at all warrant the claim of appropriation. There was no act or declaration by him that he was appropriating the culm as his own, or that he assumed title to it or indication from him that he intended to preserve the culm for use or sale. "There was the truck and there was the dump car," and Carter's employees used both as a means of hauling away and dumping upon the

most convenient and accessible spot, which happened to be on contiguous land, great quantities of refuse for which there was no use or sale.

We said in Russell v. Stratton, 201 Pa. 277, 278: "Abandonment is to be determined from a consideration of the property and the conduct of the plaintiff in relation to it." Adopting here that principle as a rule of authoritative standard, what evidence is there that Carter all through the subsequent years of his life performed one act negativing appellant's claim that at the time of first depositing the culm on the Coxe land he relinquished possession and abandoned it? What was his subsequent conduct in relation to it? He lived for thirty-one years after taking control of the mines in 1862 and through that long period made no use of the culm nor asserted title to it and neither in the deed by which the entire mining property was conveyed to him in 1876, nor in any record or letter found by his executors or in his last will and testament was there a single direct or indirect reference to the culm bank. He certainly never exercised any act of dominion over it, he never sold it or gave it away. On the other hand, his employees and others, numbering hundreds, were accustomed daily and continuously, through many successive years, to gather and carry away in the aggregate large quantities to serve as fuel in their homes, and for which they paid nothing. We are here in conflict with the referee's tenth finding of fact, to the effect that the culm thus taken was a part consideration for rentals the employees paid to Carter for use of houses on his land as residences. This finding is not included in appellant's assignments of error, but clearly the evidence is such as to compel a different conclusion from that of the referee. At the beginning of Carter's operations the rental was intended to include the coal which miners needed in their homes, and later separate but varying charges were made for that fuel. It was, however, coal from the mines they paid for, not from the culm bank; the only restric-

tion was that employees should not take coal from loaded cars. To those miners who lived some distance from the collieries the coal was hauled; those who lived "alongside the banks" could and often did, as a matter of convenience, gather up fuel they found about the banks; but it is plain from the testimony that it was only good coal from the collieries they were to have and pay for. There was never any charge made for coal picked from the culm pile. Likewise, other persons, not employees, living in the vicinity, helped themselves regularly to the culm for fuel, and the whole extent of prohibitive action taken against this public appropriation is shown by the testimony of Dickerman, one of plaintiff's witnesses, who said: "I think they [the mine superintendents] occasionally told people not to do it." Yet nothing was done to stop such taking. Other and vast quantities of the culm were openly, with Carter's knowledge, and without objection on his part, taken away in cars for railroad purposes. It was testified by plaintiff's witness, Wear, that at least five thousand tons were hauled away by the Lehigh Valley Railroad Company to be used as ballast and to fill up washouts made by rain, for which Carter received no compensation. In fact, it appears that whenever the railroad company, from time to time, needed mine refuse for filling-in or other purposes, it would bring cars to the culm dumped on the Coxe property and haul away sufficient to meet its requirements; and if, as was testified, "there was an ash bank near by, they would take ashes; if they wanted coal dirt [culm], they would take coal dirt." The railroad never paid for any of the culm thus taken. Even more illustrative of this general and unimpeded taking of the culm was the proceeding by which the Bethlehem Zinc Company took five thousand or more tons from the culm bank. A resident of the vicinity, not an employee of Carter, contracted with the zinc company to furnish the culm from the bank on the Coxe property for a stipulated price. He hired men to load

it' on cars, and paid their wages from his own pocket and received the contract price upon delivery of the culm. To this proceeding Carter was not a party in any sense and received no portion of the contract price. Proof is entirely lacking that even his consent was asked. Stephen Farrow, son of the contractor referred to, who in this transaction attended to his father's clerical work, testified that to his knowledge there was no arrangement made with Carter, and if there had been he would have "probably known all about it"; asked if his father had taken the coal without permission, all he could answer was: "No, I guess not." It is of course true, as plaintiff contends, that Carter, if he had legal possession of the culm, could sell or give it away as he might wish. But the elements of sale or gift are not to be found in these many and continuous acts of free and general appropriation of the culm. We cannot even credit him with indifferent benevolence, since there is no proof that he ever gave away any of the culm. There must be some adequate reason or condition to support the presumption that the owner of property or of rights to property intends to preserve them; and if the thing claimed to be abandoned is considered valueless and a hindrance in his own opinion and is so considered by the general opinion of the community, the presumption that he intends to preserve such property cannot arise. Inherent to possession is the right to exclusion; and if through a duration of many years no act or attempted act of exclusion is exercised by a presumed possessor, and through all that time the thing, such as the culm bank here in question, is openly, freely and continuously depleted, taken and carried away in vast quantities, without compensation or permission asked, the intention, if it ever existed, to exclude others has disappeared; and when there never was, before and after these open appropriations, assertion of title or acts of dominion exercised, the conclusion is inevitable that the legal possession has been relinquished and the thing abandoned.

The course pursued by Carter with respect to the culm bank through the latter part of his life bears out the theory of abandonment to the utmost point. To his adult son, who survived him and was a beneficiary under his will, Carter at no time made a single intimation of a claim of title to the culm. After his father's death the son and a representative of the executors examined the Coleraine property, saw the culm on the Coxe land and wholly ignored it; and at the time the executors sold the Carter holdings there was no reference made to the culm bank and of course it was not included in the conveyance.

We come now to the declarations Carter is said to have made, which, as claimed by appellee's counsel, reveal a continuous and permanent intention not to abandon the culm. The referee concludes in his eleventh finding of fact, assigned as error by appellant, that these were declarations "indicating his claim of ownership of the banks and his belief in their value." The referee, evidently not greatly impressed with their weight as testimony, could go no further than to accept them as "indicating" Carter's attitude toward the culm bank. We cannot go that far, for we do not discover in them anything more than a mere expression of an indication to do something that was never done, or attempted to be done, and a vague prediction that in the indefinite future the culm might attain a value. The first of these declarations, said to have been uttered some five years after Carter began to operate the mines, was: "Some day these banks will be very valuable." Somewhere between 1876 and 1879, he is said to have remarked: "I intend to preserve them for my children's children." Yet it was in the year 1876 that he bought out his partner Schoener, thus becoming sole owner of the Coleraine property, and, in the deed conveying to him that interest, there is not the slightest reference to the culm and it certainly did not figure as a part of the property he then acquired. Another remark made about thirty-one years

after he took control of the collieries was an intimation that he was "going to place $100,000 in the concern and he was going to look after the banks so he could ship more," but, added the witness, "he did not particularly refer to the banks." Clearly these declarations denote nothing as to a claim of title, much less prove anything supporting such interest. It is true that, after thirty-one years the small sized coal mixed with the culm had attained a limited marketable value. But it may not be claimed that Carter, learning of this recent creation of value, after many years of actual abandonment of the culm, could regain legal possession and control over it by the utterance of vaguely expressed ideas as to the probable future value of it and indefinite suggestions as to what he might do with it in years to come. The culm or refuse of a mine is the property of the mine owner. This property he may abandon, either by carting it away or by suffering it to go where it will be undisturbed. When once abandoned, any one may appropriate it, provided it is not reclaimed before such appropriation: Barringer and Adams' Law of Mines and Mining, 608.

The case of Sturdevant v. Thomson, 280 Pa. 233, to which both appellant and appellee refer, is not applicable to the litigation before us. Material facts and circumstances in each case are different. There, as appellant in its brief properly states, there was a feigned issue on a sheriff's interpleader to determine title to certain culm, alleged to have been abandoned by lessee, when he ceased operations under the lease. That agreement contained a specific recognition of the culm as property to be owned by lessee, when produced, and upon which he was to pay royalty if sold by him, and a reference to the record in that case shows the court below found that at the time of the execution of the lease a prospective market of the culm was considered and a possibility of fixing in the lease its measure of financial return to lessor, if sold. This lease was executed in 1898, when a pro-

spective market for .culm had to a limited extent developed, and this was thirty-six years after Carter took over the Coleraine mines and at a time when culm was considered, throughout the anthracite mining regions of Pennsylvania, a thing of no value and for which there was no market. What we actually decided in the Sturdevant Case was that the lease constituted a sale of the coal, and with it of course the culm, to lessee; and, as to the matter of abandonment, we said the case was ruled in principle against appellant by Russell v. Stratton, 201 Pa. 277, where the lessee of a quarry left upon leased premises a quantity of cut stone and certain tools, which it was claimed he had abandoned. It was, however, proved that sometime after the lessee's departure he had made several attempts to sell the stone, thereby openly announcing his continued claim of ownership and dominion over the. property and sustaining the claim of nonabandonment. In the case before us, Carter,—from the moment he began to throw culm, considered at that time worthless residue, upon the heap where his predecessors had been in the habit of depositing it also,—never, by act or document or word, asserted title to the culm or dominion over it. He cast it away on land not his own, presumably for the sole purpose of getting rid of it, and thereafter to the end of his days at no time bothered about it.

. We sustain appellant's first, second, third and seventh assignments of error, and hold that the culm in dispute here became vested in to appellant, owner of the land upon which it had been deposited. Consideration of the remaining assignments becomes unnecessary.

Judgment reversed.