In re G.M.P. LAND COMPANY, Debtor.

LEGAL COAL COMPANY,
INC., Plaintiff,

v.

G.M.P. LAND COMPANY, Defendant.

Bankruptcy No. 81–03640 T.
Adv. No. 82–2244.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 13, 1983.

Edward E. Kopko, Pottsville, Pa., for plaintiff.

Edward I. Swichar, Philadelphia, Pa., for defendant.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

In this adversary proceeding, Legal Coal Company, Inc. (hereinafter "Legal Coal") seeks to permanently enjoin G.M.P. Land Company (hereinafter "GMP") from interfering in any way with Legal Coal's alleged rights to an estimated 30,000 tons of coal silt located on GMP's property. We shall, however, deny Legal Coal's request for injunctive relief because, for the reasons hereinafter stated, we find that Legal Coal has abandoned its ownership interests in the silt in question.[1]

## FINDINGS OF FACT

1. Legal Coal operated an anthracite coal preparation plant from 1940 to 1970.

2. In the plant's coal preparation process, silt was produced as a by-product.

3. Silt is a very fine, moist material that contains limited amounts of coal.

4. From 1954 or earlier until 1970, Legal Coal deposited upon its own property some of the silt which it produced.

1. This Opinion constitutes the findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

5. From approximately 1954 until 1970, Legal Coal deposited some of the silt which it produced upon two different sites upon the adjacent property of Henry Lark, with Mr. Lark's apparent permission.

6. The silt which Legal Coal deposited upon its own property was generally of a better quality than the silt which it deposited upon the Lark property.

7. From 1954 or earlier until 1970, Legal Coal deposited the waste material from the coal preparation process upon its own property and in an area intentionally segregated from any silt deposits.

8. For a period of years until 1970, and from 1980 to 1982, Legal Coal sold some of the silt, after processing, which it had deposited upon its own property.

9. Legal Coal has never sold nor removed any of the silt which it had deposited upon the Lark property.

10. Between approximately 1954 and 1970, Legal Coal never had any actual nor prospective customers for the silt which it had deposited upon the Lark property because of a lack of demand for such silt.

11. Between approximately 1954 and 1970, the silt in question was of no use to Legal Coal and had no commercial value, and it was uncertain whether or not it would ever be of any use or acquire any commercial value.

12. The silt in question did not acquire any commercial value until approximately 1978.

13. In 1975, the Lark property was conveyed to GMP.

14. At the time of said conveyance, of which Legal Coal was aware, Legal Coal did not request permission from GMP to use GMP's property for storage of the silt nor did Legal Coal communicate with GMP in any manner regarding the silt deposits in question.

15. Legal Coal did not notify GMP of its claim to the silt in question until November, 1981, after GMP had applied to the Pennsylvania Department of Environmental Resources for a permit to mine the silt.

16. Legal Coal has never kept any records whatsoever regarding the silt in question.

17. Although Legal Coal has kept and continues to keep records of its inventory, the silt in question has never been included nor designated as a part of Legal Coal's inventory.

18. Legal Coal has no documents nor records which in any way indicate its ownership of the silt in question.

19. Legal Coal never performed any maintenance whatsoever of the silt in question nor of the sites on which the silt was deposited.

20. Legal Coal never posted any signs, barriers, or other indications whatsoever on or near the sites of the silt deposits in question, or elsewhere, that it claimed ownership of the silt.

21. No evidence was presented that Legal Coal ever had any agreement or understanding with Henry Lark regarding Legal Coal's right to subsequent use of the silt in question.

22. Since no later than 1975, one of the two sites on which the silt in question was deposited was used as a dumping ground for assorted trash, junk, and garbage by local residents. As a result of the condition of the site, a fire hazard exists. In order to alleviate the fire hazard, GMP sealed off the public access to the site in approximately 1981 or 1982 at the request of the Pennsylvania Department of Environmental Resources. This use of one of the sites as a dumping ground has caused the contamination and concomitant decrease in current value of some of the silt.

23. Since no later than 1975, some of the silt in question on one of the two sites has been washed into an airhole of an abandoned strip mine.

24. The silt in question was deposited by Legal Coal in abandoned strip-mining pits in order to lessen erosion of the silt. However, contrary to Legal Coal's contention, there is no evidence that another purpose of depositing the silt in such pits was to facili-

tate removal of the silt by Legal Coal at some future time.

25. From 1970 until 1982, on a weekly basis, a Legal Coal stockholder and his brother took turns "keeping an eye" on the silt in question for the purpose of "[M]aking sure there wasn't any type of a runoff so they wouldn't be infringing on DER regulations." (Notes of Testimony, p. 51)

26. Dr. Hugh Curran has been a director and stockholder of Legal Coal since 1942.

27. Dr. Curran has been a practicing dentist since 1942.

28. Dr. Curran has never been an employee of Legal Coal.

29. Dr. Curran has never been involved in the day-to-day operations of Legal Coal.

30. Dr. Curran took no part in the decision to deposit the silt in question upon the Lark property.

31. Dr. Curran testified that Legal Coal deposited the silt in question upon the Lark property with the expectation that Legal Coal would remove and sell it if and when it acquired a commercial value.

## DISCUSSION

The sole question in this case is whether, according to Pennsylvania law, Legal Coal has abandoned its ownership interests in the silt in question. If so, its claim for injunctive relief must be denied.

Under Pennsylvania law, it is well-established that coal or coal by-products, when severed from the earth, become personal property which may be abandoned when left on the land of another with the intention of abandoning them. *Llewellyn v. Philadelphia and Reading C. and I. Co.,* 308 Pa. 497, 162 A. 429 (1932); *Fidelity-Philadelphia Trust Co. v. Lehigh Valley Coal Co.,* 294 Pa. 47, 143 A. 474 (1928). "Abandonment includes both the intention and the external act by which the intention is carried into effect; intention may and indeed often must be inferred from acts." *Llewellyn, supra,* 308 Pa. at 502, 162 A. 429. Furthermore, abandonment is to be determined from "a consideration of the nature of the property and the conduct of the plaintiff in relation to it." *Russell v. Stratton,* 201 Pa. 277, 278, 50 A. 975 (1902).

As both parties recognize, the leading Pennsylvania case regarding abandonment of coal by-products is *Fidelity-Philadelphia Trust Co. v. Lehigh Valley Coal Co., supra.* In *Lehigh Valley,* William T. Carter, an owner of mining property, died in 1893. His executors sold the mining property in 1893. In 1908, upon information received from the late Carter's son, the executors asserted that the Carter estate held title to a culm bank located on property adjacent to the former Carter property. Culm, like silt, is a by-product of the coal preparation process. The bank had been formed from 1862 to 1876 by Carter's hauling of culm from his property to the culm bank. The current owner of the adjacent property, who did not own the property at the time the culm bank was being formed, asserted title to the culm bank, claiming that the culm had been abandoned by Carter and was, therefore, not part of the Carter estate. In 1908, after the culm had acquired a limited commercial value, the Carter estate sued the adjacent property owner for wrongful conversion of the culm.

The Court in *Lehigh Valley* found that the culm was not usable and was of no commercial value during the time that Carter was depositing it upon the adjacent property. According to *Lehigh Valley,* once it is established that material deposited upon the property of another was of no use and no commercial value during the time it was being deposited, it is incumbent upon the party opposing a determination of abandonment to prove affirmatively that the person or entity that allegedly abandoned the material actually intended to retain ownership of the material, in light of all of the circumstances of the case. In this regard, the Court, in determining the question of abandonment, followed *Russell v. Stratton, supra,* by focusing in on Carter's conduct in relation to the culm. The Court found that Carter did not, between 1862 and his death in 1893, use or sell the culm nor assert title to it nor exercise dominion

over it. Furthermore, there was no documentary evidence indicating Carter's intention to retain ownership of the culm. Also, he did not act to prevent others (mainly employees and local residents) from taking some of the culm for their own purposes.

Carter's estate presented evidence that Carter had, both during and after his depositing of culm on the adjacent property, made statements that some day the culm would be very valuable and that he intended to preserve the culm for his grandchildren. However, the Court found that these statements constituted vaguely expressed ideas as to the probable future value of the culm and indefinite suggestions as to what he might do with the culm in the years to come. It determined that these statements were insufficient to establish Carter's intention to retain ownership of the culm in light of its other findings indicating a contrary intention. 294 Pa. at 66–67, 143 A. 474. The Court concluded that the culm in question had been abandoned and ruled in favor of the defendant.

■ In the present case, the silt in question, as with the culm in *Lehigh Valley,* was not usable and was of no commercial value during the time that Legal Coal was depositing it upon the adjacent property. See Finding of Fact # 11. Therefore, in accord with *Lehigh Valley,* Legal Coal must prove affirmatively that it actually intended to retain ownership of the silt, in light of all of the circumstances of the case, in order to prevent a finding of abandonment.

■ We believe that Findings of Fact Nos. 13 through 23, *supra,* constitute substantial evidence of an intent by Legal Coal to abandon the silt in question. These Findings of Fact are generally similar to those findings upon which the *Lehigh Val-*

*ley* Court based its determination of abandonment.[2]

In rebuttal, Legal Coal claims that it deposited the silt in question with expectations of its commercial value, removal and sale at some unspecified time in the future. See Finding of Fact # 31. However, as in the case of Mr. Carter's aforementioned statements in *Lehigh Valley,* we find Legal Coal's asserted expectations to be too vague and indefinite to constitute significant evidence of an intention to retain ownership of the silt in light of all of the circumstances of this case.

Legal Coal also argues that its intentional segregation of its waste material from its silt deposits evidences an intention of non-abandonment of the silt. See Finding of Fact # 7. While this argument has some merit, it is far from sufficient, in itself, to overcome all of the other aforementioned Findings of Fact (13 through 23) evidencing an intent to abandon. Furthermore, this argument bears directly only upon the period of time ending in 1970, when the coal preparation plant ceased functioning, and, therefore, cannot be used to show any ongoing evidence of intent after 1970.

Another argument advanced by Legal Coal is that its weekly "inspections" of the silt in question from 1970 to 1982 indicated that it did not intend to abandon the silt. See Finding of Fact # 25. The record is not clear as to the nature of these "inspections". They appear to have been cursory at best. Without more, we cannot find them to be substantial evidence of an intention of non-abandonment in light of all of the circumstances of this case. In this regard, see *Universal Minerals, Inc. v. C.A. Hughes and Co.,* 669 F.2d 98 (3d Cir.1981), where the Court, in interpreting Pennsylvania law, stated that regular inspections of a

---

2. In *Lehigh Valley,* Carter did not act to prevent others (mainly employees and local residents) from taking some of the culm for their own purposes. It is true that, in the present case, there is no evidence that others helped themselves to the silt in question. However, Legal Coal has (a) failed to perform any maintenance whatsoever of the silt deposits in question, (b) permitted one of the silt deposits to be used as a public dumping ground, with the resultant contamination and decrease in current value of some of the silt, and (c) permitted the erosion of some of the silt in question (see Findings of Fact Nos. 19, 22, and 23). We believe that these failures to act by Carter and Legal Coal are of similar import in considering the issue of abandonment.

culm pile by a party who had allegedly abandoned the pile are not sufficient evidence to require a finding of non-abandonment of the culm pile. Furthermore, in the present case, one of the two people who performed these "inspections" testified that he was not even aware of GMP's actions in sealing off one of the two sites from public access because of its being a fire hazard. See Finding of Fact # 22. The other person who performed the "inspections" was not available to testify. In addition, these "inspections" did nothing, of course, to prevent one of the two sites from becoming, in effect, a public garbage dump and trash heap. See Finding of Fact # 22.

Legal Coal also argues, in attempting to distinguish *Lehigh Valley,* that it deposited the silt in question on the Lark property because it did not have sufficient space on its property to do so. It is true that the *Lehigh Valley* Court mentioned that there was no evidence that Carter did not have sufficient space on his property upon which to deposit the culm. However, we find no indication that this was an important factor in the Court's decision, either expressly or impliedly. At any rate, Dr. Curran's testimony on this point was ambiguous. For example, the following exchange occurred during the cross-examination of Dr. Curran (Notes of Testimony, pp. 28–29):

Q. Sir, if necessary, there was room on the Legal Coal property back in the fifties and sixties to dump that silt if absolutely necessary. Is that correct?

A. Possibly we could have made the room.

Q. You could have made the room if necessary?

A. That would be pretty tight.

Q. It would be tight, but you would have the room if necessary. Is that correct?

A. I'd say no to that question.

Q. What would you have done with the silt?

A. I don't know, I wasn't in a position to make that decision.

Therefore, we do not find persuasive Legal Coal's argument in this respect, and find that it fails to show any intention on the part of Legal Coal to retain ownership of the silt in question.

Another Legal Coal contention is that its depositing of the silt in question in abandoned strip-mining pits shows that it intended to retain ownership of the silt. This is true, Legal Coal argues, because it did so with the intention of lessening erosion of the silt and facilitating its removal by Legal Coal at some future time. There is no evidence that facilitating removal of the silt was one of the purposes in placing it in these pits, but we agree that it was placed therein in order to lessen its erosion. See Finding of Fact # 24. However, we find no particular causal connection between the desire to lessen erosion of the silt and the intention to retain ownership of the silt. It appears from the record that the pits were as convenient a place as any in which to deposit the silt. Also, it would seem that taking steps to lessen erosion of any material is a matter of propriety as well as a safeguard against possible environmental law penalties and repercussions, whether the material is deposited upon one's own property or upon the property of another.

Therefore, we find that this argument fails to signify any substantial evidence of Legal Coal's alleged intention to retain ownership of the silt in question, particularly when considered in light of all of the circumstances of this case.

Having considered Legal Coal's arguments, we conclude that they do not set forth, either individually or in combination, substantial evidence of Legal Coal's alleged intention to retain ownership of the silt in question when considered in light of all of the circumstances of this case. Given that, at the time the silt deposits in question were made upon another's property, the silt was of no use and had no commercial value, Legal Coal has failed to prove affirmatively that it intended to retain ownership of the silt. On the contrary, the weight of the evidence, particularly Findings of Fact

Numbers 13 through 23, clearly indicates that Legal Coal has abandoned the silt.

Therefore, because Legal Coal has abandoned the silt in question and retains no ownership rights therein, we must deny its claim for injunctive relief respecting the silt.