**COLUMBUS–AMERICA DISCOVERY GROUP, INC., Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, its engines, tackle, apparel, appurtenances, cargo, etc., located within a box defined by the following coordinates: Northern boundary—31° 37′ North latitude; Southern boundary—31° 33′ North latitude; Western boundary—77° 2′ West longitude; Eastern boundary—76° 57′ West longitude (believed to be the S.S. CENTRAL AMERICA), in rem, Defendant.**

Civ. A. No. 87–363–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 14, 1990.

Richard T. Robol, Philip N. Davey, Robert M. Tata, Hunton & Williams, Norfolk, Va., William J. Kelly, Jr., Curtis A. Loveland, Robert W. Trafford, Porter, Wright,

Morris & Arthur, Columbus, Ohio, for plaintiff.

Guilford D. Ware, Crenshaw, Ware & Martin, Norfolk, Va., Douglas A. Jacobsen, Bigham, Englar, Jones & Houston, New York City, for claimants Atlantic Mut., et al.

William W. Nexsen, Stackhouse, Rowe & Smith, Norfolk, Va., John H. Reilly, Jr., Dickerson & Reilly, New York City, for Harry G. John and Jack F. Grimm.

Daniel R. Warman, John Y. Richardson, Jr., Williams, Worrell, Kelly, Greer & Frank, Norfolk, Va., for the Trustees of Columbia University in the City of New York.

## OPINION AND ORDER

KELLAM, Senior District Judge.

This admiralty action filed in this Court on May 27, 1987, is an outgrowth of the tragedy of the sea which occurred September 12, 1857, when the Central America sank in the Atlantic Ocean some 160 miles due East of Charleston, South Carolina, where the Gulf Stream meets the Sargasso Sea. She was said to be one of two luxury passenger ships making a run from Aspenwall, Panama, to New York. She was a wooden-hulled, side-wheel steamship built in 1852. During the period prior to completion of the railroad from the East to the West Coast in 1869, travel from San Francisco to New York was principally by steamer to Panama, by train across the Isthmus of Panama to the port of Aspenwall, and then on to New York by steamer. Much of the gold mined in California following the gold rush of 1849 shipped or carried by passengers to the East was by the above route. The subject of this action involves gold shipped and carried by passengers over the above route.

I.

On August 20, 1857, the Pacific Mail Steamship "Sonora" left San Francisco for Panama with a number of passengers and quantities of gold aboard. It docked at Panama on September 3rd. The passengers and gold were put upon the Panama

Railroad for the three hours journey to Aspenwall. The passengers with the gold which they were carrying and the shipped gold were placed upon the side wheeler Central America. The Central America sailed at 4:00 p.m. on September 3rd for Havana. It docked at Havana on September 7th in the evening. After transfer of some passengers and cargo, it sailed on September 8th at 9:30 a.m. for New York. On the evening of the 9th, it encountered the fringe of a hurricane and sailed on into its fury. As a result of the forces of the hurricane, a leak in the ship developed on the morning of the 11th and by 2:00 p.m. of that day, the fire in the boilers was extinguished by the influx of water from the leak. With the continuation of the storm, efforts of the crew and passengers in bailing the ship failed to keep her afloat. Many passengers were transferred by the life boats to two passing steamers, and some others were hauled from the water hours after the Central America sank.

News of the tragedy was collected from survivors. Newspapers over several areas of the world collected and published stories of the sinking. Frank Leslie's Illustrated Newspaper published in New York for October 3rd, 1857, reported that when the Central America left Havana for New York, it carried 492 passengers exclusive of the crew. Of that number, 166 were rescued and 336 lost their lives. Many of the passengers were gold miners returning to the East to invest their findings, and others to collect their families and return to California. He further recorded that the Central America was the richest ship, passengers and cargo considered, that was ever engulfed in the waves of the sea, when her rich freight of gold was lost.

The Chicago Tribune, in an article of September 23, 1857, reported that many of the surviving passengers of the Central America stated there was seldom so large an amount of money owned by passengers as those aboard the Central America, numbers of whom reckoned their gold by thousands. The New York Journal of Commerce, in an article of September 23, 1857, said that the exact number of saved and lost would probably never be known, but that it was generally agreed that when she left Havana, she had on board nearly 600 and that the number saved varied between 166 and 187.

Passenger Jane Badger, who was one of the rescued, said her husband was carrying $17,500.00 with him in gold coins in a carpet bag until just before the ship sank. Passenger Caldwell saved 20 pounds of gold dust carried in a belt around his waist. One passenger reported he had $2,000.00 in gold in a belt. There were other accounts of passengers who had been carrying gold with them aboard the Central America.

In a report to the Secretary of the Navy, Lt. Matthew Fontaine Maury, USN, under date of October 19, 1857, said that there was on board 575 persons and about two million in gold. He further reported that the information concerning the sinking had been compiled from newspaper reporters who had obtained much information from the survivors.

A.

During the last decade, substantial efforts were made to locate the wreck of the Central America. Such efforts were expensive and time consuming. Scientific and historical research required many hours. Plaintiff in this case, as well as the insurance claimants, located numerous newspaper articles published concerning the sinking of the Central America and the loss of life. The services of experts in many fields have been enlisted. Special equipment was and is required for any such type of undertaking. Patience, skill, long hours of hard work, and some degree of luck, a willingness to risk and a deep pocket are and were necessary for such an undertaking. Plaintiff has expended in excess of ten million dollars in the project. While plaintiff is positive it has located the Central America, it is still engaged in its efforts to bring to the surface the artifacts and portions of the cargo. One will well understand that only portions of the cargo will be found.

## II.

Utilizing numerous written accounts, oceanographic, meteorological and other data, modern search theory mathematics, advanced technology and equipment, along with the services of numerous experts, the Columbus–America Discovery Group undertook the search for the wrecked Central America. A specially equipped ship was obtained for the undertaking. Among the equipment was a side-scan sonar, satellite navigation, tele-operated deep-sea equipment (submersible with stereo camera and robotic arms) and computer modeling software, all of which helped to make the discovery possible.

The Central America is said to have settled upright. Since 1857, the Central America has been attacked by the forces of the deep sea. The iron works of her two coal-fired engines, boilers and other fixtures have partially disintegrated under the corrosive action of the salt water and her wooden hull has collapsed.

Thomas G. Thompson, a research scientist in the area of ocean science, headed the undertaking. He pointed out that in preparation for the undertaking, examination was made of hundreds of newspaper articles, statements by numbers of the some 160 survivors, and other information. Thompson said he spent some 13 years researching the historical and technical aspects of the shipwreck of the Central America. Correlation of the data of the survivors—eye witnesses—dealing with conflicts in the accounts and separating the facts from speculation was exceedingly difficult and time consuming. Commencing the search necessitated the development of probability search maps. This required a determination of the probable location of the sinking. Consideration had to be given to the accuracy of the navigational information available as to the probable location of the ship at the time of its sinking, to the quality of the information furnished, to the normal prevailing currents, to what a hurricane does to the normal currents, to the movement of the ship as it begins to fill with water, to how the ship acts as it sinks, to the manner in which it sinks, and to how the information of action of the weather of that day fit into the advanced knowledge and skills of today. Models were created to try to determine drifting patterns and windblown currents and to try to determine how fast and how far a ship would drift under such conditions. Experts making use of these types of information prepared a probability map of where to search for the wrecked vessel. Too, study had to be made of what might be revealed by the sonar. Very little work like this had been done before. In the search, plaintiff found hundreds of what the experts called anomalies on the sea floor which had to be interpreted. They developed a computer process to assist them in undertaking the analysis of these anomalies. Upon analyses, a determination was then made of the most likely targets for the Central America. Many things affected what type of object appeared on the sonar. The sonar ability was much ahead of the interpretative skills. After one develops his or her best guess as to which image is the target he is looking for, it is then necessary to make a number of passes over the object, use video cameras, and to study the image and data in order to undertake to reach a better understanding. There is no set pattern to follow. One must determine what would be expected to remain of a ship which had been in that depth of water some 132 years. It is a new field in science. No one before has seen a ship that has been in that depth of water for that long a period of time.

It was after many hours and days of tedious research and study that plaintiff could determine the most likely targets. The first target thought to have been the Central America was not in fact it. It so happened that one of the earlier targets turned out to be the Central America. Only after re-examining the images in great detail, and location of the ship's bell, was plaintiff fully convinced it had located the famous wreck.

## III.

## HISTORY OF LITIGATION

As shown above, this admiralty action was commenced by complaint filed May 27,

1987. Plaintiff asserted this Court had *in rem* jurisdiction over the portion of the wreck found and brought within the jurisdiction of this Court and *in personam* jurisdiction over any potential claimants who made contacts with this forum; that the said wreck was wholly derelict and had been abandoned by the owners; that plaintiff is the owner of said wreck and has taken the necessary action to exercise complete and absolute dominion and control over it and is entitled to the exclusive possession of it, and to the protection of this Court; that in any event, it is entitled to a liberal salvage award; that plaintiff is entitled to an injunction enjoining others from interfering with its recovery efforts; and it prays that a warrant of arrest issue, and the Marshal take into custody the artifacts, articles and such portions of the defendant wreck, cargo and artifacts as may be presented. In due time, a motion for a substitute custodian was filed.

On July 7, 1987, an amended complaint was filed enlarging the radius of the search area, an order for arrest was entered and directed to be executed, and a substitute custodian named. By that order, plaintiff was directed to, within 10 days after execution of the process, to cause public notice of the action and arrest to be given for not less than 5 consecutive days in the Virginian–Pilot, a daily newspaper published in Norfolk, Virginia, setting forth the docket number of the action, a general description of its nature, the fact of arrest, and requiring any person claiming any interest to file their claims and answers within 45 days. The warrant of arrest was issued and executed July 7, 1987, following which the properties were turned over to the substitute custodian. Pursuant to motion, on July 9th, a temporary restraining order was issued restraining the R/V Liberty Star (Star), her master, officers, crew and all persons aboard, the Board of Trustees of Columbia University, Lamont–Doherty Geological Institute (Trustees), S.S. George Law Partnership (Law) and Boston Salvage Consultants, Inc. (Boston), from conducting salvage operations, photographing, entering or causing to enter on or above the surface within the designated boundaries as defined in the order. A cash bond of $100,000.00 was required and posted and a copy of the TRO duly served. A hearing was scheduled for July 16, 1987. On July 10th, a motion, with an incorporated supporting brief, was filed by Law, Trustees and Boston who appeared specially and moved to dismiss the TRO issued on July 9th for lack of jurisdiction, and to contest the award of exclusive salvage rights of plaintiff. The motion set forth that movants were involved in a deep water survey, search, identification and salvage operation in a section of the Atlantic Ocean approximately 160 nautical miles off the coast of Georgia believed to be the area in which a passenger vessel traveling from Havana to New York, known as the Central America, sank during a hurricane on September 12, 1857; that from historical information and newspaper accounts, movants believe the vessel may have contained gold in significant quantities; that if they can locate and identify the vessel, they intend to salvage it for profit; that they have conducted the search operation by using a side scan sonar and a deep water tow fish with depressors capable of providing rapid and reliable information about the sea floor and features; that possible targets revealed by the sonar are investigated further by the use of underwater camera equipment, including real time video, still frame and ocean data censors; and that salvage operations will ultimately be effected by the use of a remotely operated vehicle capable of handling the remains of a vessel and retrieving its contents. The motion continued by asserting "activities of George Law are being conducted in association with Columbia University...." (p. 3 of Motion and Brief); that considerable funds have been expended and it is entitled to continue until it or a competing interest actually locates and salvages the vessel.

Following the hearing on July 16, 1987, the Court, by order filed July 17th, enlarged the TRO into a preliminary injunction. Notice of appeal was filed and a motion presented to one of the judges of the Forth Circuit Court of Appeals for a stay of the enforcement of the injunction.

By opinion of that judge filed August 10th, the stay was denied. By motion of August 13th, 1987, the appellants moved to dismiss the appeal.

On August 20, 1987, S.S. George Law Limited Partnership and Boston Salvage Consultants, Inc. filed their answer herein denying the allegations of the amended complaint, and counterclaimed. In their counterclaim, they asserted they were organized for the purpose of locating the wreck of the Central America and salvaging it, and that upon information and belief the plaintiff had abandoned their undertaking. Plaintiff responded and denied the allegations of the counterclaim. Subsequently, on December 18, 1987, upon joint motions of the parties, the answer and counterclaim of S.S. George Law and Boston Salvage were dismissed with prejudice.

On September 8, 1987, plaintiff moved the Court to hold Dana Leonard, Master of the M/L Cameron Seahorse, Steadfast Oceaneering, Inc., Zapata Gulf Marine Corp., South Carolina Marine Archeological Trust and Walter Kreisle in contempt of court for violation of the injunction order of July 17, 1987, and for entering or attempting to enter the restricted area. An order to show cause was issued. Following a hearing, the Court found the parties guilty of civil contempt, and ordered them not to release any information discovered in connection with the violation of the injunction. Plaintiff thereafter sought to recover damages, costs and attorney's fees incurred as a result of said parties violating the injunction. By opinion of January 25, 1988, the Court, having found all of said parties in contempt, postponed the assessment of damages, costs and attorney's fees to give them an opportunity to purge themselves by no further violations of the injunction.

On March 23, 1989, a second amended complaint was duly filed, expanding the area to a radius of 50 miles, ordering arrest or seizure of artifacts, and appointing substitute custodian. Publication of notice of arrest was ordered for five consecutive days in the Virginian–Pilot, requiring claimant to file their claim within 10 days after process was executed and their answers within 20 days. The notice was duly published. On June 15, 1989, plaintiff filed a motion for award of title to all properties recovered. By order of August 18, 1989, adopting the findings of fact and conclusions of law filed June 30, 1989, the Court enlarged the preliminary injunction into a permanent injunction and ordered the release of the cash bond to plaintiff.

On August 30, 1989, plaintiff filed a third amended complaint setting out enlarged boundaries. The Court ordered arrest, and publishing of notice as in the previous order. By order of September 29, 1989, the answers of Atlantic Mutual Insurance Company and some 38 other companies were filed, asserting that by reason of payments made for losses, they were subrogated to the rights of the owners in the cargo of gold; that they were making claims on behalf of themselves and the account of the owners; and that they are the owners of said properties and entitled to possession thereof. On the same day, they filed an answer denying each of the allegations made by plaintiff in each count of their complaint.

On October 13, 1989, Dennis Standefer filed a claim asserting that pursuant to a contract with Thomas G. Thompson, he was entitled to a share of any recovery made by Thompson from the Central America. On October 19, he filed an answer denying plaintiff was entitled to the full recovery and that he was entitled to a share of any recovery. Standefer also instituted a separate suit against Thompson, asserting he is entitled to recover a portion of any sum received by Thompson in this action. That action was thereafter merged with this suit. Because that claim was for alleged breach of contract and against Thompson, who is not a party to this suit, upon motion the Court dismissed the claim filed in this suit by Standefer, with right to file an amended claim within 10 days against plaintiff in this suit. By way of information, a motion of Thompson for summary judgment in C/A 89–753 has been granted and that suit dismissed.

A final pretrial order was entered in this action March 16, 1990. Among other things, it was stipulated:

(A) Plaintiff has been engaged in search and recovery of defendant wrecked and abandoned sailing vessel within the coordinates—(those of the 3rd amended complaint).

(B) The wreck is the remains of the S.S. Central America which sank September 12, 1857.

(C) Central America had not been successfully salvaged before commencement by plaintiff.

(D), (E) & (F) Plaintiff is an Ohio corporation which conducts deep ocean discovery and salvage, and has located and recovered items from the Central America shipwreck.

(G) The general location of the wreck is approximately 160 miles off the East Coast of United States in the Atlantic Ocean, about 1½ miles below the surface.

(H) & (I) Claimants were not the owners of the cargo prior to its sinking and have never marked the wreck or any of the cargo of the Central America.

(J) through (Q) London Assurance Association was established by Royal Charter in 1720; Alliance Assurance Company, Limited, was established 1824; Atlantic Mutual Insurance Company was incorporated April 11, 1842 by the laws of New York, Royal Exchange Assurance by Royal Charter in England, The Indemnity Marine Assurance Company, Limited, July 4, 1824 in England, Marine Insurance Company Limited in England in 1836, and The Salvage Associates established in England in 1856 and incorporated by Royal Charter in 1867.

By order of March 29th, the Court dismissed some 21 of the named insurance company claimants with prejudice. Though agreeing to the dismissal, defendants desired dismissal without prejudice. The list of dismissals is shown in Appendix "A" hereto attached. By that same order, the Court directed claimants to file on the morning of trial a statement of their claims setting forth the name of the claimant, the name of the shipper, the insured, identification of the specific property shipped, the value of each shipment and the name and similar information as to each coinsurer as it relates to the cargo.

On March 29, and April 2, 1990, respectively, Harry G. John and Jack F. Grimm and the Trustees of Columbia University (Trustees) moved to intervene to assert a claim to any interest in any find or salvage, asserting they had furnished information to the plaintiff or that plaintiff had used information belonging to them. On their representation that they were ready to proceed with trial on April 3rd and to prove their claim, they were on April 3rd, 1990, over objection of plaintiff, permitted to intervene and their respective claims were ordered filed. They were further granted permission to add to the final pretrial order the names of witnesses and to list exhibits deemed necessary to prove their claims. Plaintiff was granted right to add lists of exhibits and names of witnesses in rebuttal of their claims. By order of April 3rd, 1990, the Court foreclosed the filing of any further claims in this action. Trial commenced and the presentation of evidence was concluded on April 12th. Counsel requested and were granted the right to file briefs and argue the case orally on July 11th, 1990. A transcript of the argument and additional briefs were filed the end of July and the case submitted for decision.

By agreement with the parties, the Court was to determine (1) whether the artifacts and items recovered from the Central America were a find or whether the operation was a salvage; and (2) whether any party other than plaintiff established any right, title or interest in the items. If the Court determined the operation was not a find, then the Court would hold further hearings to determine and deal with the rights of the insurance companies.

## IV.

Jurisdiction of the Court is not now an issue. A claim to title of lost property by occupancy "may be asserted in an *in rem* proceeding instituted once the goods have been recovered and brought to shore within the jurisdiction of the court." *Treasure Salvors, Inc. v. The Unidentified*

*Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 567 (5th Cir.1981) (Salvors III). The law of maritime salvage and finds protects the rights of one who undertakes such a recovery project to carry it to completion without interference from others who seek to share in the enterprise and reward. *Id. See also Columbus–America Discovery Group, Inc. v. The Unidentified, Wrecked and Abandoned Vessel,* 1989 A.M.C. 1955 (E.D.Va.1989). The *res*— or at least the greater portion of it—is within the jurisdiction of this Court. The Court has previously determined it had jurisdiction of the res and the subject matter of this suit. Those who sought to question it withdrew their appeal and dismissed their cause of action.[1] Such determination has therefore become the law of the case. No one since that time has sought to raise the issue. The present claimants have submitted to the *in personam* jurisdiction of the Court.

Section 1333 of Title 28 U.S.C. grants federal courts jurisdiction of all cases involving admiralty or maritime claims. "The subject matter jurisdiction granted by this statute is not limited to causes of action arising from events or occurrences on the territorial waters of the United States." *Salvors III,* 640 F.2d at 566. "Claims arising out of ... effort to recover ships disabled or abandoned at sea to retrieve their cargo ... are unquestionably within the admiralty jurisdiction of the federal courts." *Id.* Hence, courts of the United States take jurisdiction "of suits on maritime claims arising out of transactions and occurrences anywhere in the world." Ch. 1, §§ 1–19, page 51, *The Law of Admiralty,* 2nd Ed.1925, Gilmore & Black. The above language was quoted with approval in *Salvors III,* 640 F.2d at 566–67.

### A.

■ The law of admiralty is clear that a salvor has a valuable interest in his salvage, and "in extraordinary cases, such as this one, where the property has been lost or abandoned for a very long period ... the maritime law of finds supplements the pos-

sessory interest normally granted to a salvor and vests title by occupancy in one who discovers such abandoned property and reduces it to possession." *Salvors III,* 640 F.2d 567. *See also Treasure Salvors Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, etc.,* 569 F.2d 330, 336 (5th Cir.1978) *(Salvors I ).* The law "acts to afford protection to persons who actually endeavor to return lost or abandoned goods to society as an incentive to undertake such expensive and risky ventures...." *Salvors III,* 640 F.2d 573.

A real issue here is whether salvage law or the adjunct law of finds should be applied. The insurance companies contend the law of salvage should be applied here, while plaintiff contends the law of finds is the applicable law. The insurance companies rely upon the authority of M. Norris, *The Law of Salvage,* § 150 (1958), and cases following his theory. That theory is referred to in *Salvors I.* The opinion there makes it clear that courts "have rejected the theory that title to such property can never be lost and have applied the law of finds. *Wiggins v. 1100 Tons, More or Less of Italian Marble,* 186 F.Supp. 452, 456–57 (E.D.Va.1960). *See Nippon Shosen Kaisha, K.K. v. United States,* 238 F.Supp. 55, 59 (N.D.Cal.1964); *Rickard v. Pringle,* 293 F.Supp. 981, 984 (E.D.N.Y.1968)". *Salvors I,* 569 F.2d at 336–37. "Under this theory, title to abandoned property vests in the person who reduces the property to his or her possession." *Id.*

Norris, in his treatment on salvage, as do insurance companies here, suggests difficulties may be brought about by applying the law of finds rather than that of salvage. The Court in *Salvors I* dealt with this question and said it failed to see how the law of salvage would provide a more effective deterrent to a clash, as under find or salvage, an award goes to the one who is able to seize possession.

■ There are two considerations in determining whether property has been *lost* or *abandoned.* First, whether the location of the property is known, and second, even

---

1. Trustees were parties to the original action, but not to the appeal.

if its location was known, whether it has been abandoned.

"Lost" means not able to find, its whereabouts unknown, unable to locate, no longer possessed, removed from reach or attainment.

■■■ "Abandonment" means a yielding to natural impulses, to withdraw protection, support or claim; to desert; to cease intending or attempting to perform; to terminate possession or protection. "Abandonment includes both the intention and the external act by which the intention is carried into effect; intention may and indeed often must be inferred from acts." *In re G.M.P. Land Co.*, 33 B.R. 729, 731 (1983); *Llewellyn v. Philadelphia and Reading C. and I. Co.*, 308 Pa. 497, 502, 162 A. 429 (1932). Whether there is abandonment is to be determined from "a consideration of the nature of the property and the conduct of the parties [plaintiff] in relation to it. *Russell v. Stratton*, 201 Pa. 277, 278, 50 A. 975 (1902)" *Id.* "Whether a sunken wreck has been abandoned is a question of fact." *Bunge Corporation v. Agri–Trans Corporation*, 542 F.Supp. 961, 969 (N.D.Miss.1982), *aff'd* in part, vacated in part on other grounds, 721 F.2d 1005 (5th Cir.1983). Abandonment "may be accomplished by either an express or implied act of leaving or deserting the property without hope of recovering it and without the intention of returning to it." *Id. See also Chicago and North Western Transportation Company v. Kalo Brick & Tile Company*, 450 U.S. 311, 313, 101 S.Ct. 1124, 1128, n. 2, 67 L.Ed.2d 258; *Ellis v. Brown*, 177 F.2d 677 (6th Cir.1949).

■■■ "Whether property has been abandoned is a question of intent, which may be inferred from all of the relevant facts and circumstances. *United States v. Manning*, 440 F.2d 1105 (5th Cir.), *cert. denied*, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971)". *United States v. Sylvester*, 848 F.2d 520, 525 (5th Cir.1988). Valid abandonment occurs "by an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it." 3A *Benedict on Admiralty* § 134 (7th Ed.1980); *Bunge, supra,* 542 F.Supp. at 969.

■■■ The difference between lost and abandoned property is that in the first instance it often is involuntary while in the second instance it is by intent and design. Abandonment is the voluntary relinquishment of a right. Clearly, personal property of all kinds may be abandoned by an owner with the view of divesting himself of title and ownership. In determining the question of whether property has been abandoned, consideration must be given to the property, the time, place and circumstances, the actions and conduct of the parties, the opportunity or expectancy of recovery and all other facts and circumstances.

■■■ Plaintiff asserts that it is vested with absolute title to the properties in question under the law of finds. "Under this theory, title to abandoned property vests in the person who reduces that property to his or her possession." *Salvors I*, 569 F.2d at 337. There, in holding that the trial court had correctly applied the law of finds, the Court pointed out that "[D]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." *Id.*

The law of salvage for a number of years governed the location of recovery of ships and their cargo lost at sea. "Modern courts, however, have rejected the salvage law theory that title to property can never be lost. They have instead applied the law of finds under the doctrine of *animus revertendi* (the owner has no intention of returning)" (citations omitted). *Chance v. Certain Artifacts Found and Salvaged from the Nashville A/K/A The Rattlesnake, Her Engines, etc.*, 606 F.Supp. 801, 804 (S.D.Ga.1984), *aff'd* 775 F.2d 302 (11th Cir.1985). Thus, "in a first finder situation, the law of finds and salvage merge to give the first finder/salvor the sole possession of the property." *MDM Salvage, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.*, 631 F.Supp. 308, 311 (S.D.Fla.1986). The common law of finds, and not maritime salvage law, was

applied to determine ownership of a shipwreck even though within the confines of a national park and the territorial sea of the United States. *Klein v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985). In *Platoro Limited, Inc. v. The Unidentified Remains of a Vessel,* 518 F.Supp. 816 (W.D.Tex.1981), the Court, in dealing with an issue of whether the State had title to a found shipwreck said "if the State insists that it has title to the res, the Court could find that the State had abandoned the res (by never executing any contract or otherwise indicating possession of the res) and the finder of the abandoned property gets to keep the find. The Court in *Indian River Recovery Co. v. The China,* 645 F.Supp. 141 (D.Del.1986) applied the law of finds and pointed out that demonstration of possession and control of abandoned property is the prerequisite to an award of title under the law of finds. *See also Hener v. United States,* 525 F.Supp. 350, 356 (S.D. N.Y.1981).

In *Rickard,* cited above, the Court held that title to a propeller recovered from a vessel abandoned on the ocean floor for sixty years vested in the first finder lawfully and fairly appropriating it and reducing it to possession with the intention to become its owner.

In order to determine the ownership of a shipwreck on the outer continental shelf—outside the territorial waters of the United States—the Fifth and Eleventh Circuits relied on the law of finds instead of the maritime salvage law. The Court reasoned that because application of maritime salvage law was predicated on the fiction that the owner of the wrecked vessel was still in existence, it would be absurd to apply maritime salvage law to a vessel whose very location had been lost for centuries. Instead, "the Court held that title to abandoned property vests in the person who reduces that property to his or her possession, (citations omitted), [and] [T]he common law of finds is the appropriate law to examine to determine the ownership of the shipwreck." *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985). "The common law of finds generally assigns ownership of the abandoned property without regard to where the property is found." *Id.* There are two exceptions, neither of which is applicable here.

In *Wiggins, supra,* the court sitting in admiralty held that the party who first finds and recovers derelict property at sea is entitled to full title. There, the ship had been sunk some 66 years. The Court held that even though lapse of time and non-use are not sufficient, in and of themselves, to constitute abandonment, under certain circumstances, they may give rise to an implication of intention to abandon. *See also* the following cases: *Martha's Vineyard Scuba Headquarters, Inc. v. The Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1065 (1st Cir.1987); *Commonwealth of Massachusetts v. Maritime Underwater Surveys, Inc.,* 1987 A.M.C. 2590, 2606 (Mass.1987), *aff'd* 1989 A.M.C. 425, 403 Mass. 501, 531 N.E.2d 549 (1988); *Cobb Coin Company, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc.,* 549 F.Supp. 540 (S.D. Fla.1982); *Eads v. Brazelton,* 22 Ark. 499, 79 Am. Dec. 88 (1861); *Deklyn v. Davis,* 1 Hopk. Ch. 135 (N.Y.1824); *Creevy v. Breedlove,* 12 La.Ann. 745 (1857); *State by Ervin v. Massachusetts Co.,* 95 So.2d 902 (Fla.1956), *cert. den.,* 355 U.S. 881, 78 S.Ct. 147, 2 L.Ed.2d 112 (1956); *Steinbraker v. Crouse,* 169 Md. 453, 182 A. 448 (1936); *Howard v. Sharlin,* 61 So.2d 181 (Fla. 1952); *United States v. Smiley,* 6 Sawy. 640, F.Cas. No. 16317 (C.C.Cal.1864); *Thompson v. United States,* 62 Ct.Cl. 516 (1926); *Wyman v. Hulburt,* 12 Ohio 81, 40 Am. Dec. 461 (Ohio 1843).

### CLAIMS OF COLUMBIA UNIVERSITY AND JOHN AND GRIMM

On April 2nd, 1990, Columbia (Trustees) submitted a motion to intervene in this action. Trial had long before been scheduled to commence on April 3rd. Upon their agreement, they were ready to proceed without change of date for trial. They were permitted to intervene. In their claim filed on April 3rd, they set forth that since 1980, they had sought to locate and

recover the wreck of the Central America; that in February 1984, Santa Fe Communications, Inc. (Santa Fe)[2] contracted with Trustees to map a twenty nautical square mile area of the Continental Margin of the Eastern United States encompassing the coordinates of 31 degrees 30 minutes North latitude, and 77 degrees West longitude in an effort to find the Central America; that such a search was made and the survey imaged several acoustic targets of man-made artifacts, only one of which was large enough or reflective enough to be echoes of the size of the Central America[3] that Thomas G. Thompson, the lead man of plaintiff's search in 1986 requested of Trustees information of the survey; and that Trustees furnished portions of the information from the survey to Thompson. Trustees contend that the information furnished lead plaintiff to the location of the Central America. Trustees further assert that they were among those enjoined by the Court by the injunction order of July 17, 1987, from searching in the area where plaintiff was searching, and that two weeks previous to filing their claim, they learned that plaintiff had expanded the area of its search. Trustees assert that by reason of their survey of 1984, they have an ownership interest in the wreck or claim to any recovery, and they are entitled to a liberal award for their services.

Harry G. John and Jack F. Grimm, like Trustees, on April 3rd, 1990, the day the trial of this suit commenced, sought to and were permitted to intervene. They assert that John is the successor in interest to Santa Fe; that since 1984 they have sought to locate and recover the Central America; and that John, as President of Santa Fe, contracted with Trustees in 1984 to have Trustees map the area described above in Trustees' claim. The remainder of the allegations of their claim are about the same as those of Trustees.

In December 1984, Santa Fe assigned all of its right, title and interest in its properties, information or claims relative to or arising out of any attempted salvage of the Central America to the Province of St. Joseph of the Capuchin Order—St. Benedict Friary of Milwaukee, Wisconsin (St. Joseph). Sometime in early 1990, John obtained an assignment back from St. Joseph. Grimm is a party because of some arrangement he had with Santa Fe to share equally with Santa Fe in any recovery from the Central America. Since the filing of the claim by John and Grimm, St. Joseph has obtained an agreement between John and Grimm to pay over to it a portion of any sums they may recover.

While there is much evidence concerning the dealings between John, Santa Fe and St. Joseph, most of it has little or nothing to do with the issues before the Court of whether Santa Fe or John and Grimm have any right to share in any recovery by plaintiff.

### A.

In the early 1980's, Thomas Thompson was doing research on information relative to a possible salvage of the Central America and putting together a group to finance such an undertaking. John was a person interested in such an undertaking and had discussions with Thompson. John requested Thompson to obtain information for him. In the negotiations, Thompson made suggestions of what services might be obtained for such an undertaking. On December 12, 1983, Thompson wrote John enclosing a prospectus from a charter company to provide a "Sea Marc Deepsea Survey System," [Plaintiff's exhibit 439[4]], as prepared by Williamson & Associates, a firm headed by M.E. Williamson. The prospectus gave information about personnel available and their qualifications. It also gave a brief description of the capabilities of the Sea Marc I and II and made reference to

2. The claim of John and Grimm, as does Trustees, grows out of the activity conducted by Trustees for Santa Fe from whom John and Grimm obtained an assignment.

3. Bishop's investigation, hereafter dealt with, disagrees with this contention, as do plaintiff and others.

4. Hereafter plaintiff's exhibits will be referred to by number only.

the equipment of Lamonte–Dougherty Geological Observatory, a unit of Columbia University (Trustees). It pointed out that it was the policy of Trustees to make public the data obtained by work done by them. However, Thompson was not employed for the survey. Exhibit 432 is a proposal submitted to John on behalf of Santa Fe by Trustees, dated February 14, 1984, for a Sea Beam Mapping of Continental Margin in Vicinity of 30 degrees 30 minutes North and 77 degrees West. Among other provisions, the agreement between Santa Fe and Trustees provided (1) Trustees would be free to publish the results of the research, without restrictions, one year after termination of the contract, and (2) Santa Fe could send personnel to examine the progress of the work, and from time to time, require a more detailed search of a particular area. Santa Fe in fact did have aboard the survey ship some three persons to observe the work. The contract was to terminate September 30th, 1984. The contract was reviewed for Santa Fe by its counsel who reported on the terms and made certain recommendations. Among other things, counsel pointed out that Trustees reserved the right to publish any information obtained, and in Exhibit 440, on page 2 of the attachment, "suggested the possibility that even likely locations ... would be made known to the world ... [and because] John ... has no control over dissemination, someone else might ... be able to put together a project using this information before Mr. John can do so himself." Later in the letter it suggested there should be provisions for immediate reporting to Santa Fe of any likely or suggested target, so that it might at that moment be further pursued. Again on the third page, it called attention to the danger of permitting publication. A change was made in the contract to restrict publication for one year from completion of the contract. Upon completion of the survey, Trustees made a report to Santa Fe.

Exhibit 445 is a memo from Captain O'Connell to John dated April 25, 1984, relative to the Central America for an operation in July, on certain targets, some or all of which were apparently those reported in the Trustees' survey. O'Connell said that 8 of the 11 targets were good possibilities. However, John did not undertake this operation, and nothing came of this contact.

Sometime in early 1986, Thompson contacted Dr. Ryan at Columbia relative to the survey it had made for Santa Fe and asked to be furnished certain information from it. He wrote Dr. Ryan on February 12, 1986 saying that pursuant to his telephone conversation of that day, he would like to have copies of the some 20 8 × 10 negatives of the sonar record done by Sea Marc in the February 1984 survey; that he was submitting the order primarily out of personal interest, and he had a personal source of funds available for such collection and correlation; that Ryan should bill him personally for up to $250.00 for the material; and to send them to his (Thompson's) home address which he set out in the letter. (Trustees' Exhibit 2)

By letter of March 19, 1986, (Trustees' Exhibit 3) the Division Administrator of Trustees reported to Thompson that pursuant to request to Dr. Ryan, they were preparing to make contact prints of the contour map. The letter pointed out that since the data was not in the public domain and Trustees would not release the right to publication until students who were working on the data compiled and published their dissertations, "we would require your agreement that any photo-copied records or computer tapes you receive would be for your sole use and would not be reproduced for others." Thompson agreed. The parties agreed that the photos sent to Thompson were merely an index to the tapes of the survey. On April 1, 1986, Dr. Ryan wrote Thompson that the photos had been sent and that he could provide the tapes at a cost of $1,732.00. In that letter, Dr. Ryan set out the exact language as that set out in the above letter from the Division Administrator of March 19, 1986, prohibiting reproduction. Thompson paid the $250.00 and declined to obtain the tapes.

Trustees now contend that plaintiff used the information in the photos which they furnished Thompson in his efforts to locate the Central America and therefore they are

entitled to share in any recovery plaintiff may make. Trustees agree that if plaintiff did not use the information which Dr. Ryan sent to Thompson, then they have no claim and are not entitled to any portion of a recovery by plaintiff. The claim of John and Grimm is grounded in the same contention that plaintiff made use of information from the Santa Fe survey which Ryan sent to him.

Plaintiff asserts that Trustees and John and Grimm have no claim, and are not entitled to any portion of any recovery made by it.

First, as to Trustees, plaintiff says the photos sent by Dr. Ryan to Thompson were of no value to Thompson or plaintiff, and were not used by Thompson or plaintiff in the search for and location of the Central America. Further, plaintiff says that Trustees had no saleable or otherwise valuable property interest in the information from the survey and that their only interest was the right to publish it after one year from the date of the contract. Plaintiff asserts that Trustees contracted to make the survey for Santa Fe and furnish Santa Fe a report and that they were paid in full the market price for the work and the survey was the property of Santa Fe. Further, plaintiff asserts that Thompson paid the requested fee for the photographs, and that they were furnished with no restriction except that they would not be "reproduced for others."

It is asking too much to believe that if Thompson had a likely target of the Central America and he could obtain the details of the location for $1,750.00, that he would not pay that sum rather than be confronted with searching in the dark for it at a cost of $20,000.00 per day, the daily cost to operate the search vessel.

As to the claim of John and Grimm, their claim will also fail unless it is shown plaintiff used the information from the survey. Too, since Trustees reserved the right to publish this information after one year from the date of the termination of the contract, i.e., one year from September 20, 1984, and the information was not furnished until March 1986, plaintiff says John and Grimm's claim must fail. Neither John nor Grimm assert they had any contact with plaintiff or Thompson relative to the survey or a request for information, nor do they or Trustees contend there was any contractual arrangements with Thompson or plaintiff other than the restriction in the letter for reproducing the photos.

Trustees make much of the contention that they thought they were furnishing the information to Battelle Laboratories, where Thompson worked; that it was the custom for laboratories to share data; and he (Ryan) thought he was furnishing the information to the Battelle Laboratory for its study and use. In fact, Dr. Ryan stated under oath that on or about April 1986, Columbia sent copies of the sonar imagery including the imagery of the Central America wreck site to "Battelle Columbus Laboratory upon Thompson's representation that said material was for its sole use and would not be produced for others." (Tr., p. 1458) He admitted on the witness stand that the information—photos—were not sent to Battelle Laboratories, but were sent to Thompson personally at Thompson's home for his sole personal use and that they were paid for by Thompson personally and he was in error when he made the statement under oath as set out above. Not only did he admit it, but the exhibits fully show this to be a fact.

Trustees now make the contention that the survey of 1984 showed a target of the Central America and that it was of great value to plaintiff, for which they are entitled to share in any recovery made by plaintiff. However, in Trustees' report to Santa Fe at the conclusion of the 1984 survey, reference was made to one object which the report said was a good candidate as a target for the Central America.

First, Trustees, and John and Grimm, must show that plaintiff made use of the information. They admit that if plaintiff did not use it, they have no claim. Even if they prove plaintiff did use the information, they must show that the target was the Central America or that the information lead to or assisted in locating the Central America. They have not proved either

of these contentions, nor offered any credible evidence to establish such facts, and unless the Court is to indulge in speculation, conjecture, supposition or guess, there is no credible evidence in the record to establish either of these as a fact. Thompson stated clearly and without reservation that no use was made of the information furnished and there is no credible evidence in the record to suggest otherwise. The Court accepts the testimony of Thompson as an established fact. A consideration of all of the evidence supports this finding. The uncontradicted testimony establishes that commencing in 1986, and through 1987, plaintiff located several targets which might be the Central America. One in particular was an excellent candidate. A second target was located which was a splendid candidate. In 1987, they were of the opinion the second target was a prime candidate. An injunction was obtained. Upon return to sea in 1988, after further review of the sonar targets, plaintiff decided the "excellent candidate" was the target to pursue. Plaintiff decided to return to the target located in 1986 and do further investigation. They discovered side wheels, and then located the bell, which convinced plaintiff it had located the Central America. After recovery of other items, it applied to the Court for an enlargement of the injunction box.

Plaintiff argues that neither Santa Fe nor Trustees had any faith in the fact any target it located was likely the Central America. Neither Santa Fe nor Trustees sought to pursue their targets further. Santa Fe had three representatives aboard the ship during the survey. They had authority to require the ship to make a more thorough investigation of any target. It is difficult to believe that if the target set off such a "hissing" sound, as Dr. Ryan says it did, that a more thorough investigation was not then immediately done. The cost of the survey was some $300,000.00. To assemble another survey to check out the target would have been expensive. While John may have thereafter contemplated further surveys and investigation, neither John nor Trustees went back to that target or, if they did, they have failed to say so.

It seems even more unusual that in 1987, when the Court enjoined Boston Salvage, Law, Trustees and Liberty Star from attempting to interfere with plaintiff's exploration within the area defined in the injunction order, Trustees made no contention it had furnished the information of a likely target to Thompson. Moreover, even though Trustees and the others were enjoined from searching in the area of the injunction box, they were not enjoined from searching elsewhere, and inasmuch as they were not enjoined from searching elsewhere, and even though they contend the target shown in the Santa Fe survey was the Central America, and it was not within the injunction box of the 1987 Order, they at that time did not further investigate the Santa Fe survey target.

It is not expected that a lay person could have examined the information furnished by Trustees to Thompson and been able to make heads or tails out of it. Nor should or could it be expected that a person with expertise could have examined the photographs furnished, without more, and have been able to go to the location of the object. Thompson testified that some of the arrows which were supposed to identify objects appeared to be only dust spots, and other little blimps were difficult to characterize; that they did not have dimensions on them and there was not enough information to affect his interest one way or another; that when he saw the information, he decided it was of no value and getting the digital data would be of no assistance or value.

The testimony of expert Bishop—one extremely qualified in dealing with sonar and sonar maps—reviewed the charts from the 1984 Santa Fe survey. He did so for Captain Searle who was trying to set up an expedition with John relative to a search for the Central America. He was of the opinion target 4 (the one Dr. Ryan says fit the description of the Central America) was not even a likely target. He picked out target number 3 as a possible candidate. Captain Searle is a retired Navy Captain, an ocean explorer and had served most of his 28 years in salvage, five years of which

he served as Navy's Chief Salvage Officer. He was employed by Santa Fe to evaluate the Santa Fe survey of 1984. He visited Dr. Ryan in February 1986, and wrote a memo of his conversation with Dr. Ryan, from which he testified. On the visit, Dr. Ryan showed him the data package of the 1984 survey and what had been found. He said Dr. Ryan indicated there hadn't been any contacts found as a consequence of the survey, and that he specifically asked him "if they found anything worthy of going back and going over it again or taking photographs, and he said, no, they hadn't and he specifically said they had photographic equipment on board and they hadn't gotten it wet." (Searle Dep. p. 11) His opinion confirms Thompson's decision that the information furnished by Trustees was of no use or value. In fact, as Dr. Ryan said, the photos were only an index, but even assuming one could locate objects shown, it would make no difference here, for Thompson said that when he looked at the materials furnished, he determined they were of no value, and he made no use of the information.

Trustees, and John and Grimm, have failed to establish their claim or any right to share in any recovery by plaintiff or of Thompson. First, they have failed to establish (1) that they furnished information that assisted or could have assisted in the location of the Central America; (2) that plaintiff and/or Thompson used any information furnished; (3) even if the information was of value and was used, that any such use would entitle them to share in any recovery. Their claims are therefore DISMISSED.

### V.

This action has been pending since May of 1987. Plaintiff has, by action in this Court, enjoined and fought off two separate groups who sought to interfere with their efforts to recover and reduce to its possession the remains of the Central America and its cargo. By direction of Order of this Court of July 7, 1987, notice was timely given in this action to anyone claiming any interest or right to appear and assert such right or claim. By findings of fact filed June 30, 1989, the Court found that when the Central America was located by the plaintiff, it was in international waters, and in an abandoned and derelict condition; that plaintiff had exercised dominion and control over the wreck and reduced it to its possession; that it was in the process of recovering the artifacts and things of value; and that it was entitled to possession and full and exclusive ownership thereof.

On September 29, 1989, the Atlantic Mutual Insurance Company and some 37 other insurance companies appeared and, by leave of Court, filed their claims to all items of gold recovered from the Central America. They asserted that they had insured the commercial shipments of gold carried aboard the Central America, had paid the shippers for their loss, and were subrogated to the rights of the shippers. The insurance companies assert that it was common knowledge that regular shipments of gold were made from California to New York by way of Panama; that such shipments were insured; that some of the shippers advertised that their shipments were insured; and that there is ample evidence in the record to establish that commercial shipments were often, if not generally, covered by insurance. Reports of the sinking of the Central America from numerous newspaper accounts set forth that some shipments of gold aboard the Central America were insured and that some insurance companies paid certain of the losses. Insurance Companies rely solely upon the newspaper accounts for evidence that they were insurers, the name of the insured, the amount of the insurance, the value of the shipment, whether a claim was made, what sum was supposedly paid, and to whom. They well must rely on the newspaper articles for they have no copies of any insurance policies, invoices for shipments, proof of loss, amounts paid or other records. Without the newspaper accounts, the evidence is totally insufficient to establish any claim of the insurance companies.

Plaintiff asserts that newspaper accounts and other evidence shows that only a portion of the commercial gold aboard the

Central America was insured; that considerable amounts of gold were carried by passengers, some of which was deposited with the Purser and some kept on their person or with their baggage and personal effects; and that the record of deposits with the Purser went down with the ship.

Insurers contend that they insured and paid for loss of $1,219,189.00, and that of this sum the London insurance companies paid $766,666.00 and the American companies paid $452,523.00. They further assert that according to the New York Times of Monday, October 5, 1857, the "Sonora" (a passenger ship operating on the West Coast) carried passengers and shipments of gold from San Francisco to Panama of $1,595,497.13, and that $271,000.00 of this amount was shipped by West India mail steamer from Aspenwald direct to England, "leaving a balance of $1,324,497.13 in treasure probably lost on board the Central America." (Ap. III Claimants' Post Argument Memorandum) However, plaintiff points out that other articles of the newspapers reported that a shipment of some $400,000.00 was off-loaded at Havana, and numerous of the reports stated the gold aboard the Central America exceeded $2,000,000.00. To say that there are numerous conflicts in the newspaper accounts and reports is conservative.

### A.

First, the Court must consider whether the newspaper accounts are subject to the hearsay objection raised at trial.

Rule 802 of the Federal Rules of Evidence provides:

Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by act of Congress.

Rule 803 of said rules provides:

That the following are not excluded by the hearsay rule

(16) Statements in ancient documents. Statements in a document in existence twenty years or more the authenticity of which is established.

In a discussion of the admissibility of hearsay, we begin with the established principle that cross-examination is of vital importance in establishing the value and trustworthiness of such evidence. The requirement the witness be sworn, testify in the presence and hearing of the trier and be subject to cross examination is lost in most instances of hearsay. The restriction in the admissibility of ancient documents is "the authenticity of which is established." The purpose of the admission and exactly what is sought to be established by the item will often determine its admissibility. For instance, in *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir.1961), a 58 year old newspaper story was admitted to prove the occurrence of a fire in a public building. However, the same Court in *Poretto v. United States*, 196 F.2d 392, 395 (5th Cir.1952) ruled that newspaper articles are not admissible to prove facts stated therein. In *Montana Power Co. v. Federal Power Commission*, 185 F.2d 491 (D.C.Cir.1950), *cert. denied*, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683, old newspaper accounts on the question of navigability of the Mississippi River during the 19th century were admitted to prove navigability at that earlier date. The question often arises as to whether assertive statements in the article are admissible. In *Wathen v. United States*, 527 F.2d 1191, 1199 (Ct.Cl.1975), the Court in considering a newspaper account of a shooting, held it hearsay, but said "that insofar as they reported the fact of the shooting, resulting in death observed by witnesses, they provided reliable and substantial evidence."

In 55 ALR3d 663, a number of cases are collected dealing with the admissibility of newspaper articles in evidence. From a consideration of the cases there cited, and the case law generally as they apply the rule, the consensus of opinion seems to be that the articles are admissible for specific purposes, such as to prove the time, place and happening of the event and general information of it. There are some restrictions on the admissibility of such articles to prove the truth of certain statements or the truth of their content. Matters of public interest, where the facts are generally

known throughout the community or nation, reported in numerous newspapers and re-reported over a period of time may be a much better account of the truth than what an eye witness may remember years after the event.

Even if there be restrictions on the use of newspaper articles that are admitted in evidence, where they deal with such an event as the sinking of the Central America, they are admissible as an ancient document. The weight to be given the articles is to be determined from all of the facts and circumstances in the case, giving consideration to what is sought to be proven by the articles. That is, where the articles meet the ancient document rule, they are generally admissible and any further question usually goes to the weight of the evidence. *United States v. Koziy,* 728 F.2d 1314 (11th Cir.1984), *cert. denied,* 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). *See also Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984).

### B.

Before dealing with some of the issues raised by each of the parties, the Court should deal with the issue of whether the location of the Central America and the items removed from it are a find or whether the result of the labors of the plaintiff is a salvage. The parties agree that as between plaintiff and the insurance company the issue is whether under the facts of this case the ship and its cargo were abandoned. If it had been abandoned, then insurance claimants have no right to any part of any recovery.

There can be no doubt of the fact that the Central America was lost and its location not known.[5] Until located by plaintiff, no one claimed to have seen anything to resemble it after September 1857, the time of its sinking. Nor has anyone (other than plaintiff) come forward with information or a map of its location. For a number of years before it was located by plaintiff, many had done studies, research and at-

tempted to locate it with the idea and purpose of reaping the reward of such a recovery.

There were many newspaper articles written about the sinking back in 1857. Beyond these, information was scarce. To assemble the necessary information and equipment to attempt a search for the Central America required the expenditure of many hours of research and study. It was not a job or undertaking for a person of only ordinary skill. It required expertise in many fields and the assembling of numerous types of experts. Mr. Thompson said he did research on the Central America for some thirteen years. Research for this, and other sunken vessels, had previously been undertaken and proven costly and without success. Unusual knowledge of the Atlantic Ocean and of such an undertaking was a requirement. Any degree of success hinged on many contingencies such as equipment, personnel, weather, timing, condition and depth of the water, financing, ability of equipment to perform, and so on. Attempting recovery from water of such depth was new. So far as shown by the evidence, no one had ever before sought to search for and recover a wooden ship in such depth of water. Nor did anyone have much knowledge or information of what effect the water, tides, currents and other things would have done to a wooden vessel sunk some 132 years before. What would one really expect to see and find in such a search?

As shown above, "abandonment" includes both the intention and the external act by which the intention is carried into effect. Intention often may and must be inferred from acts or failure to act. "Whether a sunken wreck has been abandoned is a question of fact." *Bunge, supra.* What one says or does, or fails to say or do, often establishes intention. Clearly, it can and most often must, be proved by circumstantial evidence.

Some 39 insurance companies attempt to assert the rights of ownership to the cargo

---

5. Claimants cannot suggest the vessel was not lost, for they have sought throughout this proceeding to compel the plaintiff to reveal the exact location of the wreck and how they located it.

of gold aboard the Central America. That number was later reduced to some eleven and the Salvage Association which attempt to assert the claim of two companies that no longer exist. The same is true of the Superintendent of Insurance for the State of New York who attempts to assert a claim on two defunct companies. As shown by the chart submitted by the insurance companies, only one of the companies in America has a claim for as much as $150,000.00. The next highest is $98,-356.00 and two of them have claims for only $31,250.00. The division among the London companies was somewhat different.

■ The evidence establishes that in 1858, Atlantic Mutual Insurance Company, the American company with the largest claim, and Sun Mutual Insurance Company, whose claim was $79,169.00, entered into a salvage contract with Brutus Villeroi dated July 28, 1858, for an attempted salvage of the. gold from the Central America. The undertaking was to be by means of Villeroi's invention of a submarine boat at his own expense. The agreement provided the insurance companies would advance no funds, and under no circumstances were insurance companies to incur any expense or liability in connection with the attempted salvage. Nothing ever came of that undertaking. The record is totally void of any effort or activity on the part of any of the insurance companies to attempt to locate or recover the Central America. In fact, until 1979, there is no evidence of any contract between insurance companies and anyone relating to any interest in or any attempt to locate or recover the Central America. That contract is hereafter referred to. Insurance companies rely solely on the newspaper articles for the amount of insurance coverage, claims presented and payments made. Those articles indicate that the insurance companies stated they would pay the amounts of insurance due upon presentation of proper proof. The evidence established that the ordinary commercial transaction consisted of four documents which represent and take the place of the goods themselves in the financing of the transaction in past, current and all the markets of

the world. They are (1) the invoice, the merchant's bill for the goods, (2) the Bill of Lading, the carrier's receipt for the goods, (3) Draft or Bill of Exchange, the merchant's payment, and (4) Insurance Certificate, the document of guarantee. The Bill of Lading describes the package, not the contents. The expert witness explained the transaction by saying the merchant takes his invoice, obtains the Bill of Lading and insurance certificate, draws a draft on the purchaser, encloses the draft with the other three documents attached and presents this to his banker who puts the draft in process of collection. Hence, the proper proof required by an underwriter are the original bill of lading, the invoice, packing list if there was one, the insurance policy (or knowledge of its existence), and proof the goods were actually on board at time of sinking.

In this case, the insurance carriers have not been able to present an invoice, bill of lading, packing list, insurance certificate, statement from shipper that the goods were on board at time of sinking, cancelled checks or receipts showing payment of the claims or any other substantial documents or proof of their claims. Inasmuch as the news articles reported the insurance carriers had said they would pay the losses upon presentation of proper proof, and later news articles say claims were paid, it can be assumed the aforesaid documents or sufficient ones were obtained and presented. There were reports documents came by later shipments and that others were obtained from California, the point of origin for the lost shipment of gold.

The insurance carriers destroyed their records relating to the events of the Central America. Exactly when is not shown, but evidence establishes it was their custom to keep records for some five year periods, and thereafter destroy them. However, one expert on marine insurance testified that if a company intended to assert its right to subrogation, it always maintained its documents of proof of the claim and that it had paid the claim, and the fact it disposed of such documents was an indication it abandoned its claim. It is

difficult to believe that a company claiming an asset or property worth $150,000.00 in the 1800's or even early 1900's would destroy all evidence of its claim if it had any intention to pursue it, or any hope of recovery. How could one better demonstrate their intention to abandon a claim to or interest in property than to intentionally destroy every evidence of its claim, right or title thereto. It seems more than unusual that some eleven or more companies who have proof of what they say is an asset—or claim—and which they say they never abandoned, each destroyed all documents which established their right to the claim. None say they accidentally destroyed or lost the documents. They deliberately destroyed every document that would in anyway show they had an interest in such a claim and had any intention to pursue it. Why? Their actions speak clearly. They had no hope or idea they could locate the Central America, and even if they located it, they had no hope they could recover anything from it. They destroyed the documents and intended thereby to abandon any claim they might have. Such action was guided by the decision that location of the wreck was next to impossible; but, even if located, recovering it was beyond the ability of any known means. Not only was this true in 1857, and five years thereafter, but continued to be true for some one hundred years thereafter. But even after scientific means of locating ship wrecks and possible recovery in deep water became known some twenty or more years prior to the actions of the plaintiff in this case, still not one of the insurance companies undertook to locate or recover the Central America. The inaction did not stop there. The record is void of any evidence that even up to this day any one of the insurance companies ever sought to locate or have a discovery company or group undertake to locate and recover the Central America. Even in 1979 when a group was discussing or planning a search for the Central America, there is no evidence any one of the insurance companies offered to join or assist them. The same continued through 1987 when Boston and Law undertook to have INA become a party to a search. Even the Salvage Association has offered no evidence of any action on its part to locate and find the Central America. This is true to this date even though there is substantial evidence that means of locating and recovering wrecks in deep water has been in use for more than twenty years. Even so, not one of the insurance companies have even sought to contact any company or group with the idea of searching for or locating the Central America. The Salvage Association in London asserts it has been in existence for more than a hundred years for the purpose of salvaging shipwrecks, yet it has never undertaken to locate or recover the Central America, or have someone do so. Nor is there evidence any of the insurance companies or the Salvage Association ever made any inquiry of the availability of means or equipment to locate the Central America or undertake a recovery of it.

Even so, insurance companies now assert they never abandoned or ever intended to abandon their claim to the gold aboard the Central America. They ground their position in the contention they never signed any document so stating, never made any public announcement of abandonment and have always claimed to own the gold. But, their actions—and failure of actions—speak louder than words. Only once—and that was less than a year after the loss—did they even evidence any interest in an attempted recovery, and even then refused to offer financial or any other type of assistance to that recovery group. When is not known, but they deliberately destroyed all documents that would establish they had any interest in the cargo—even failing to retain a cancelled check or receipt for payment. The destruction of their records confirms the fact they abandoned any intention to retain any interest in the gold. The insurers own evidence indicates they always retain documents as long as they believe they have an interest in any subrogated items. If there had been any intention not to abandon any thought or hope of recovery, it would seem that at least one of the insurers would have kept its records of their loss. However, the evidence establishes they did keep some records of their

company for more than 100 years, but not of any claim to the Central America.

The Salvage Company attempts to assert a claim on behalf of two defunct companies, as does the Superintendent of Insurance of the State of New York. However, neither of them assert that at the time each of those companies failed or ceased business, there was listed as an asset or claim any right of subrogation to an interest in the cargo of gold aboard the Central America. Why? They had no such claim. Any claim they may have ever had was previously abandoned. If it had not been previously abandoned, it surely was at that time.

In the past ten years, several groups were making a search for the lost Central America. Considerable publicity was given to these searches. Even after much publicity was given to the plaintiff's location and commencement of recovery from the Central America, not until September 1989 did insurers attempt to assert a claim.

While time alone may not be sufficient to establish abandonment, it is an element to be considered and when considered with all of the other evidence, it has convincing power. Once the insurance companies abandoned the Central America, whether it was because of lack of means or lack of hope for recovery, the abandonment was final. Merely because means are thereafter found to locate and recover it does not reinvest ownership in them. To now suggest that in 1859 or anytime up until World War II, that an insurance executive had any intention of claiming gold located one and one-half miles below the surface of the sea, and any hope of being able to locate such an object and recover it, by saying it was property of his insurance company is stretching common sense too far. Here, the Court is asked to assume this when that very insurance executive destroyed every evidence which his company had to such a claim. It is exceedingly doubtful that any of the now claiming insurance executives had any knowledge that their company ever had such a claim until commencement of this action. If they had such knowledge, they never gave any indi-

cation such a claim was viable and had not been abandoned. If there is any executive, or anyone with any of insurer claimants, who ever heard his predecessor of the company indicate the company had a claim to any of the gold on board the Central America, he has not come forward with it. It is easy for present day persons to assert they did not and would not abandon a claim to gold in a shipwreck, knowing now the modern means for recovery—but they have not, and could not, say what their predecessors did or intended. Again, the actions—and failure to act—speak loudly.

During much of the middle and late 1800's and early 1900's, capital assets of corporations were assessed for taxes. That is, each item of real and personal property was to be valued. Hence, any personal property, gold, silver and so forth had to be reported. *See Jenkins v. Neff*, 163 N.Y. 320, 57 N.E. 408 (1900); *People v. Barker*, 144 N.Y. 94, 39 N.E. 13 (1894). Many states had similar laws. There is no suggestion that any one of the insurance companies ever listed as an asset, or as its property, any of the gold or a subrogation claim to any such gold.

In 1979, one Norman Scott of Expeditions Unlimited had some contacts with counsel for INA relative to an expedition to attempt to locate and recover items from the Central America. In a letter of April 16, 1980, Scott asserted that a group from Orlando, Florida had funded an attempt to locate the Central America. He said they had found a ship which might well be the Central America and they had returned to the site three or four times in attempts to make such determination, but attempts had not established it was or was not the Central America. He points out that if the ship is in two to three thousand feet of water, the cost of recovery will exceed one million dollars. He suggested that if private funding did not come forward, the insurance companies should contribute to the cost of the search. Nothing further seems to have come of that discussion, nor is there any evidence the insurance companies showed or took any interest in the undertaking. By letter of November 4, 1987, counsel for S.S. George Law Limited

Partnership and Boston Salvage Consultants, Inc. sought the cooperation and assistance of INA in an effort to locate and recover the Central America. Attached to that letter was a requested sale and transfer by INA to Law and Boston of any rights which INA had in the Central America for the consideration of 2% of the net proceeds from any recovery of the Central America. The project was not to cost INA anything. The assignment said the Central America was lying 200 miles off the coast of Georgia. The letter set forth that Law and Boston wanted the assignment because they thought it was in their interest to appear in an action pending in Norfolk, Virginia, (which was this suit), as a claimant of the vessel and cargo. INA did not sign the document. However, Law and Boston did appear in this litigation in 1987, to oppose plaintiff's application for the injunction. Thereafter, they dismissed their claim. Hence, as early as July 1987, INA knew there was litigation relative to the Central America and possible claims, yet neither it nor any of the other insurance companies appeared or sought to assert any right, title or interest in the Central America.

Insurers, on one hand, assert they were subrogated to the title and ownership of all of the gold aboard the Central America. On the other hand, they admit there were persons aboard who were carrying substantial amounts of gold with them which was not insured. Hence, even if insurers did not abandon their claim or title to the insured gold, and were fully subrogated to the rights of the shippers, they have no standing to claim all of the gold aboard. Numerous news reports gave the names of individuals aboard who were carrying substantial quantities of gold. One of the experts testified that between three hundred thousand and a million dollars was carried by passengers; that small amounts were carried on the person [6], larger amounts carried in carpet bags, large bags and trunks, and some individuals deposited their gold with the Purser. Too, the expert testified one commercial shipper did not

insure his gold. The expert for the insurance companies also testified that reports of personal gold were as high as $400,-000.00. He likewise confirmed much of the testimony of the plaintiff's expert.

Clearly, there were substantial sums of gold aboard the Central America other than the sums covered by insurance. Accounts fix the quantity of gold on board and going down with the ship as between one million, six hundred thousand up to two million dollars. Insurers do not contend they insured such a quantity and now agree that they did not insure all of the gold aboard.

The news accounts list Lloyd's of London as one of the insurers. It is made up of in excess of one thousand individuals. None of them has appeared to assert a claim. Too, some of the insurance companies have ceased to exist. The Salvage Company asserts it is the successor to those from London, but there is no proper document assigning any such claim. Even if the insurance companies did not abandon their claims, they would not be entitled to the total gold recovered. Too, there is no credible record of the exact composition of each shipment, whether bars, coin, dust or otherwise. More than likely, there will be no recovery of any gold dust.

Insurers say that insurance companies do not abandon cargo worth $150,000.00. It is true that few companies or individuals would abandon claims for such a sum, if there was any hope or likelihood of locating and recovering such cargo. Equally as true is the fact that if the company ever had any intention or hope of asserting or pursuing a claim to such cargo, it would certainly not have destroyed all evidence of its claim or right thereof. However, where the whereabouts of the property is unknown, and there is no known way to locate or reach it or if the cost of attempted recovery exceeds the value, the situation changes. The attitude and intentions of business people are expected to be, and generally are, rational. They don't hold on

---

**6.** There were one or two newspaper accounts of passengers carrying from two to ten thousand

dollars in money belts, and one had 20 thousand in a carpet bag.

to a claim when it is impossible to recover it or where it has no value. A clear intention of abandonment is given when all records or memorandum of the property are deliberately destroyed and no effort is made or undertaken to locate or recover the property for over a hundred years.

Considering all of the facts and circumstances in the case, the Court is satisfied that plaintiff has carried its burden of establishing by clear and convincing evidence that each of the insurance companies long ago abandoned any claim, right, title or interest that they may have had in the gold aboard the Central America. They therefore have no claim to any of the gold recovered from the Central America. Accordingly, the claims of the insurance companies and the claims of Trustees and John and Grimm are DISMISSED. Plaintiff is entitled to and is vested with the ownership to all of the gold or other artifacts recovered from the Central America.

### APPENDIX—A

The CIGNA Group;

Commercial Union Assurance Co., Ltd.;

Commercial Union Insurance Company;

William H. McGee & Co., Inc.;

Royal Insurance;

The Royal Insurance Company, Ltd.;

The Royal Insurance Company of America;

Chubb & Son, Inc.;

Sun Alliance Group;

GRE of America Corp.;

The Guardian Royal Exchange;

Indemnity Mutual Marine Assurance Company;

Sun Insurance Company of New York;

Sun Insurance Office, Ltd.;

London Associated Corporation;

The Royal Marine;

Royal Associated Corporation;

Indemnity Mutual;

Royal Exchange & London Offices;

Indemnity Marine;

Underwriters at Lloyd's;

Union Bank of London;

Commonwealth Fire Insurance Co.;

The remaining claimants are:

Atlantic Mutual Insurance Company;

Insurance Company of North America;

The Salvage Association;

The London Assurance;

Alliance Assurance Company, Ltd.;

The Royal Exchange Assurance;

Indemnity Marine Assurance Company, Ltd.;

The Marine Insurance Co., Ltd.; and

The Superintendent of Insurance of the State of New York.